**Loretta ROLLAND, et al., Plaintiffs,**

v.

**Argeo Paul CELLUCCI, et al., Defendants.**

**No. Civ.A. 98–30208–KPN.**

United States District Court, D. Massachusetts.

June 28, 2000.

Richard D. Belin, Nima R. Eshghi, Foley, Hoag & Eliot, Boston, MA, Steven J. Schwartz, Center for Public Representation, Northampton, MA, Cathy E. Costanzo, Center for Public Representation, Northampton, MA, Stacie B. Siebrecht, Matthew Engel, Disability Law Center, Boston, MA, Frank J. Laski, Mental Health Legal Advisors Committee, Boston, MA, Christine M. Griffin, Disability Law Center, Boston, MA, for plaintiffs.

Peter T. Wechsler, Attorney General's Office, Boston, MA, Judith S. Yogman, Attorney General's Office, Government Bureau, Boston, MA, H. Gregory Williams, Attorney General's Office, Springfield, MA, Ginny Sinkel, Office of the Attorney General, Government Bureau, Boston, MA, for defendants.

## MEMORANDUM WITH REGARD TO PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS (Docket No. 138)

NEIMAN, United States Magistrate Judge.

On January 10, 2000, the court approved a settlement agreement which provided, in applicable part, that Plaintiffs are the prevailing parties in this case and, as such, are entitled to reasonable fees and costs incurred through the date of approval. Because the parties could not agree on those fees and costs, Plaintiffs have moved for an award of fees in the amount of $1,510,832 [1] and costs of $178,430 pursuant to both the Americans with Disabilities Act ("ADA") and the Civil Rights Attorney's Fee Awards Act of 1976 ("CRAFAA"). The ADA allows the awarding of reasonable fees and costs to a prevailing party. *See* 42 U.S.C. § 12205 ("In any action or administrative proceeding commenced pursuant to [the ADA], the court ... in its discretion, may allow the prevailing party ... a reasonable attorney's fee, including litigation expenses and costs."). The CRAFAA framework for fee awards in civil rights actions applies here as well. *See* 42 U.S.C. § 1988(b) ("In any action or proceeding to enforce [a listed civil rights statute], the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs."). *See also Guckenberger v. Boston Univ.,* 8 F.Supp.2d 91, 99 (D.Mass.1998) (citing cases). *Cf. Paris v. U.S. Dep't of Hous. and Urban Dev.,* 988 F.2d 236, 238 (1st Cir.1993) (applying baseline § 1988 prevailing party inquiry to claim under Equal Access to Justice Act).

Defendants "partially oppose" Plaintiffs' motion on the ground that the amounts sought are excessive and suggest instead that Plaintiffs be awarded only $440,000 in fees and $80,000 in costs. For the reasons which follow, the court will award Plaintiffs $986,810 in fees and $125,361 in costs.[2]

## I. *BACKGROUND*

The court need not describe the entire factual and procedural background of this matter, it having done so in prior memoranda. *See Rolland v. Cellucci,* 191 F.R.D. 3 (D.Mass.2000); *Rolland v. Cellucci,* 52 F.Supp.2d 231 (D.Mass.1999). Suffice it to say for purposes here that the settlement agreement recognizes that

---

1. Unless otherwise indicated all figures in this memorandum are rounded to the nearest dollar.

2. In light of Defendants' suggestion that Plaintiffs are entitled to at least $440,000 in fees and $80,000 in costs, the court proposed, and the parties agreed to stipulate to, partial judgment in Plaintiffs' favor for $520,000. The court endorsed the parties' joint stipulation on May 17, 2000, and understands that $520,000 is presently in the process of being paid. (Docket No. 149.)

Plaintiffs have satisfied the relatively low threshold required to qualify for "prevailing party" status, *see Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *Williams v. Hanover Hous. Auth.*, 113 F.3d 1294, 1299 (1st Cir.1997), and are entitled to attorneys fees and costs, the calculations of which were reserved for another day. That day has now come.

Plaintiffs filed this case on October 28, 1998, after the parties engaged in unsuccessful efforts to resolve all claims short of suit. The seven named plaintiffs, who are mentally retarded or developmentally disabled individuals living in private nursing homes, asserted in their complaint that Defendants improperly failed to provide them with certain specialized services and to place them in community residences. These individual plaintiffs, together with two organizational plaintiffs, variously asserted that Defendants had violated the integration provisions of the ADA, the reasonable promptness, freedom of choice and comparability provisions of federal Medicaid law, and several provisions of the Nursing Home Reform Amendments to the Social Security Act. Defendants denied Plaintiffs' claims.

By December of 1998, all parties had consented to jurisdiction of this court. *See* 28 U.S.C. § 636(c). The court approved the parties' proposed scheduling order in January of 1999, certified the class in February, soon thereafter denied Defendants' motion to stay the certification, approved the parties' interim agreement for specialized services in March of 1999 (shortly before an evidentiary hearing was scheduled to begin), and set November 1, 1999, for trial on all remaining issues. In June of 1999, the court denied Defendants' motion to dismiss and, in the fall of 1999—

before requiring Plaintiffs to respond to Defendants' motion for summary judgment—awaited the parties' efforts to mediate their dispute. The mediation resulted in a final settlement just prior to trial. After conducting a fairness hearing on December 17, 1999, the court approved the settlement agreement on January 10, 2000.

In the midst of these benchmarks, Plaintiffs propounded two sets of interrogatories to several state agencies, deposed twenty-two witnesses and obtained and reviewed more than one hundred thousand pages of documents. The parties completed written discovery by June 4, 1999, expert tours of various facilities were concluded and reports thereon provided by July 30, 1999, and depositions were completed by August 31, 1999.

## II. *FEE REQUEST*

Plaintiffs' fee request arises out of the participation of attorneys and paralegals from four entities: the Center for Public Representation ("CPR"), the Disability Law Center ("DLC"), the Mental Health Legal Advisors Committee ("MHLAC"), and the law firm of Foley, Hoag & Eliot ("FH & E"). In support of their fee request, Plaintiffs present two summary tables. Both tables list the various attorneys and paralegals, the hours claimed to have been worked by them and each individual's hourly rate, thereby producing the total "lodestar" fee.[3] Although Plaintiffs present a lodestar of $1,652,941 in Table I, they point the court to and ultimately rely upon Table II which claims a somewhat lower lodestar of $1,510,832.

To achieve the approximately $142,000 reduction from Table I to Table II, Plaintiffs first entirely eliminated the following fee requests: Rae Lynn Schwartz, a CPR paralegal ($17,850); Chris Griffin, a DLC

---

**3.** A lodestar is the product of the number of hours reasonably expended multiplied by reasonable hourly rates. As the First Circuit explains, "[t]he lodestar method is the strongly preferred method by which district courts

should determine what fees to award prevailing parties in actions that fall within the ambit of section 1988." *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 337 (1st Cir.1997).

attorney ($16,860); Deborah Swedlow, an FH & E associate ($5,684); and Anjanette Warren ($5,402), Timothy Barouch ($5,415), Paul Schlaud ($5,358) and Joseph Mueller ($6,023), all of whom were associated with FH & E. Plaintiffs label this "reduction one." Plaintiffs also reduced "by one-third, or a total of approximately 500 hours," the time spent by their representatives prior to the filing of suit. (Pls'. Mem. in Supp. of Mot. for Award of Att'ys' Fees and Costs (Docket No. 140) ("Pls.' Mem.") at 21.) This "reduction two," Plaintiffs claim, is reflected in a five percent reduction from the Table I lodestar and "is equivalent to a *complete* elimination of all time by all plaintiffs' counsel from September 1, 1997 – March 1, 1998, when they primarily engaged in fact investigation, legal research, organizing a litigation team, and drafting legal memos on the various causes of action." (*Id.* at 22 (emphasis in original).) [4]

Plaintiffs also claim to have deleted or reduced various entries even prior to formulating Tables I and II. Thus, Plaintiffs assert, their attorneys completely eliminated time spent on legislative or media-related efforts, court appearances where a particular attorney did not actively participate, and clerical or organizational tasks. In this regard, Steven Schwartz, an attorney with CPR, claims to have eliminated one hundred and forty-five of his hours (*see* Pls.' Exhibits, Vol. III (Docket No. 143), Ex. 24 ¶¶ 11–13); Cathy Costanzo, another CPR attorney, claims to have eliminated one hundred and fifty hours (*see id.,* Ex. 25 ¶¶ 18–20); Matthew Engel, a DLC attorney, claims to have eliminated fifty hours (*see id.,* Ex. 27 ¶ 6); Stacie Siebrecht, another DLC attorney, claims to have eliminated two hundred and sixty-eight hours (*see id.,* Ex. 28 ¶¶ 11–13); and Hal Poret, an FH & E associate, claims to have eliminated twenty-five hours (*see id.,* Ex. 31 ¶¶ 6–7). Somewhat similarly, Richard Belin, an FH & E partner, claims to

have eliminated time he expended with an expert who did not submit a report, some publicity-related tasks, certain travel time, as well as the time of several FH & E lawyers and paralegals who played a limited role in the case, (*see id.,* Ex. 30 ¶¶ 23, 24, 27), although he does not specify the total number of hours thereby eliminated.

In total, Plaintiffs claim that they deleted or reduced over seven hundred and twenty-five additional hours actually spent on the matter. In addition, Plaintiffs claim to have billed travel time at half the attorneys' normal hourly rates (by halving the number of hours traveled) and to have declined to request an enhancement of the adjusted lodestar despite their right to do so.

### III. *DISCUSSION*

■ A court's analysis of a civil rights fee request is not done in a vacuum. "In applying for judicial approval of a fee award, it is the plaintiff's burden to furnish the evidence required, not the court's burden to seek it out." *Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 527 n. 11 (1st Cir.1991). Likewise, a defendant's objection needs a certain level of particularity and specificity. *See Domegan v. Ponte,* 972 F.2d 401, 420 n. 35 (1st Cir.1992) (defendants' failure to produce evidence of market rates means they cannot prevail on rate-based objection to fee award), *vacated on other grounds,* 507 U.S. 956, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993); *Rogers v. Okin,* 821 F.2d 22, 30 (1st Cir.1987) (noting that the realities of fee award reviews "compel objectors" to "select priority targets and marshall the facts as effectively as possible"); *Brewster v. Dukakis,* 786 F.2d 16, 18–19 (1st Cir.1986) (recognizing defendants' obligation to object with some particularity to plaintiff's fee application).

■ To determine a proper fee award, a court must necessarily "engage in a

---

**4.** Although Plaintiffs describe the five percent reduction as "proposed," (Pls.' Mem. at 21), it is clear from their papers that, in fact, they seek the amount of fees calculated after the application of both reductions "one" and "two."

thoughtful analysis of the number of hours expended and the hourly rates charged to ensure both are reasonable." *Guckenberger,* 8 F.Supp.2d at 100. *See also King v. Greenblatt,* 560 F.2d 1024, 1026–27 (1st Cir.1977). In doing so, the court is obliged "to see whether counsel substantially exceeded the bounds of reasonable effort." *United States v. Metro. Dist. Comm'n,* 847 F.2d 12, 17 (1st Cir.1988) (citation and internal quotation marks omitted). Typically, a court computes the lodestar "by ascertaining the time counsel actually spent on the case 'and then subtract[ing] from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary.'" *Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir.1992) (quoting *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984)). Then the court applies hourly rates to the various tasks, considering the prevailing community rates for comparable attorneys. *Id.* To say that a trial court mulling a fee request must fashion a lodestar, however, "is not to say that the court is in thrall to an attorney's time records." *Coutin,* 124 F.3d at 337. The court, in its discretion, "can segregate time spent on certain unsuccessful claims, eliminate excessive or unproductive hours, and assign more realistic rates to time spent" and, ultimately, "may fashion a lodestar which differs substantially from the fee requested by the prevailing party." *Id.* (citations omitted).

In light of these standards, Plaintiffs have presented extensive memoranda in support of their motion, together with three volumes of exhibits, which address the factors to be considered by the court when sculpting an award. In particular, Plaintiffs discuss the amount of time spent on the case, its novelty and complexity, the accelerated pace of litigation, their need for multiple attorneys and paralegals, Defendants' opposition and purported resistance to settlement, the extensive discovery and numerous experts required, and the reasonableness of the rates claimed. Plaintiffs also describe how they exercised billing judgment and explain why the costs

requested are both reasonable and compensable. Finally, Plaintiffs maintain that there is no reason to reduce any portion of their request because of time spent on unsuccessful or non-meritorious claims:

> It is indisputable, that the Settlement Agreement provides virtually all of the relief sought by the Plaintiffs in this case. Every member of the Plaintiffs' class who would benefit from active treatment must receive the specialized services they need by April 30, 2000 and every classmember who would benefit from community living must be placed in an integrated community setting by June 30, 2007.

(Pls.' Mem. at 6.)

Although, in response, Defendants assert what they label a "partial" opposition only, they propose that Plaintiffs be awarded less than thirty percent of the fees sought and less than fifty percent of their costs. In calling for such a drastic reduction, Defendants claim that (1) several of Plaintiffs' advocates failed to provide contemporaneous time records, (2) the litigation was overstaffed, (3) an excessive amount of time was spent on certain tasks, included unwarranted duplication, (4) various attorneys' hourly rates are too high, (5) the court should defer awarding fees to the executive director of MHLAC given state law uncertainty on the propriety of awarding fees to that state agency, and (6) Plaintiffs' request for over $178,000 in costs is excessive.

Unfortunately, Defendants' objections are often too general to be of significant assistance to the court. Still, many of the arguments underpinning Defendants' opposition are well taken and the court will center its discussion around those objections.

### A. Contemporaneous Time Records

Defendants first claim that at least one of Plaintiffs' attorneys, Mr. Engel, and two CPR paralegals failed to provide contemporaneous time records. As the First

Circuit explains, "the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Grendel's Den, Inc.,* 749 F.2d at 952.

■ Plaintiffs concede the point with respect to the two paralegals, Rae Lynn Schwartz, whose fees they are not seeking to recover in any case, and Kathleen Eddy, for whom Plaintiffs seek fees of over $37,-000. Although Ms. Eddy claims to have worked full-time on the case beginning just prior to the preliminary injunction hearing in March of 1999, she failed to keep detailed contemporaneous time records of her work and only in the context of this petition has she explained the nature of her efforts during her six months at CPR and, then, only in two month blocks. Given the lack of detail, the court will reduce Ms. Eddy's time by fifty percent to 378.6 hours.

Plaintiffs argue, however, that Mr. Engel, the only attorney specifically named in this objection, did, in fact, keep detailed contemporaneous time records. In fact, Defendants' claims with respect to Mr. Engel and other unnamed individuals are not borne out by the record. Mr. Engel avows that he recorded his activities contemporaneously, except for those occasions when he was working outside the office when he recorded the activities immediately upon his return. Moreover, the affidavits of Mr. Schwartz and Ms. Costanzo, on which Defendants rely in further support of their opposition, do not help their argument. The affidavits actually support Plaintiffs' position that these two attorneys actually spent more time on the case than they recorded. (*See* Pls.' Exhibits, Vol. III: Ex. 24 ¶¶ 9 and 11; Ex. 25 ¶¶ 16 and 18.) Accordingly, other than the problems raised by Ms. Eddy's and Ms. Schwartz's records, the court is satisfied that the exhibits proffered by Plaintiffs "adequately limn the different tasks performed, the nature of the work, the time consumed, and the dates when effort was expended." *Lipsett,* 975 F.2d at 938.

### B. *Staffing*

Defendants next claim that the litigation on Plaintiffs' behalf was overstaffed, that such staffing led to inflated billing, and that Plaintiffs' retention and use of eight experts caused counsel to devote excessive time to consultation and coordination. In support, Defendants claim that the four primary attorneys who worked on this matter, who have justifiably claimed expertise in disability law, should not have required the assistance of fourteen other attorneys and paralegals, nor should they have needed to devote a majority of their time to this matter. Defendants also assert that Plaintiffs' billing records, as well as the use of multiple attorneys and paralegals at events such as meetings and depositions, created unnecessary duplication, inefficiency, and overstaffing. Unfortunately, Defendants provide little substance to support these conclusory assertions and fail to specifically address the documents provided by Plaintiffs' attorneys or the accommodations they made prior to asserting their claim for fees.

■ As Plaintiffs point out, the complexity of a case is a fundamental consideration in determining whether its staffing is reasonable. *See Lipsett,* 975 F.2d at 939 (citing cases). The use of multiple attorneys in a significant, lengthy civil rights action certainly is understandable. In one particularly appropriate example, the Second Circuit approved the use of multiple attorneys in a challenge to conditions at the Willowbrook Developmental Center in New York. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983). This case, like the Willowbrook matter, involves a large class of individuals with disabilities and a number of novel time-consuming legal claims. If anything, the instant case is more logistically complex than the Willowbrook class to the extent it is comprised of individuals living in nursing facilities dis-

persed throughout the state, rather than in a single state facility, and insofar as here there are numerous state agencies sharing responsibility for class members.

In addition, the legal claims asserted here were complex. There were eight distinct causes of action and, at the time this case was filed, there had not yet been a similar class action favorable to mentally retarded or developmentally disabled individuals anywhere in the country. Nor had any court adjudicated the rights of nursing facility residents to receive reasonably prompt or comparable community services under the Medicaid Act and the ADA. This complexity made multiple attorneys necessary to manage both the discovery process and the expert panel. In particular, the time and effort in coordinating the experts' tours in various parts of Massachusetts and producing nine expert reports from seven experts in six months was, in the court's opinion, herculean.

Moreover, this litigation proceeded expeditiously, necessitating multiple counsel. *See Guckenberger*, 8 F.Supp.2d at 100–101. Although Defendants make much of the fact that the case was resolved without a trial in less than one year, it was an exceptionally busy year for all involved. Within the first five months, mandatory disclosures were completed, a class was certified, Defendants' request to stay the certification was denied, Defendants' motion to dismiss was heard by the court, the parties completed expedited discovery on Plaintiffs' motion for a preliminary injunction on specialized services and Plaintiffs' motion for a preliminary injunction was settled provisionally. At a hearing on March 29, 1999, the court revised the scheduling order and, declining to isolate the community placement issue, set the matter for trial on all issues on November 1, 1999, just one year after the original complaint was filed. The parties thereupon completed all written discovery by June 4, 1999, expert reports by July 30, 1999, and depositions by August 31, 1999, all as required. Only when discovery was complete and the trial looming did the parties engage in an intensive period of mediation which enabled them to settle the matter in the fall of 1999. In all, the schedule required both Plaintiffs and Defendants to commit to an extensive legal undertaking in a very short time, thereby requiring a larger litigation team than might otherwise have been necessary.

The litigation was also vigorously contested by Defendants, as was their right, until discovery was completed and settlement negotiations commenced. "Since a litigant's staffing needs often vary in direct proportion to the ferocity of her adversaries' handling of the case, this factor weighs heavily in the balance." *Lipsett*, 975 F.2d at 939. *See also City of Riverside v. Rivera*, 477 U.S. 561, 580 n. 11, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."); *Rodriguez–Hernandez v. Miranda–Velez*, 132 F.3d 848, 850 (1st Cir.1998) (citing *Lipsett* in context of "extreme defense"). Although the court finds overwrought Plaintiffs' description of Defendants as having "adopted an oppositional and reflexively adversarial posture," (Pls.' Mem. at 14), the court did observe a vigorously contested matter, made necessary not only by the novel issues involved but by the divergent views of the parties with respect to the proper treatment of the class. This caused ongoing disputes with respect to discovery, the certification of the class, the stay of that certification pending appeal, and Defendants' motion to dismiss the case in its entirety. Even after settlement was reached, the court needed to resolve issues with respect to notification of the class and approval of the parties' agreement.

■ In the face of the effort expended, Defendants' conclusory assertion that this litigation "did not require more than four attorneys of varying experience levels," (Defs.' Partial Opp'n to Application of Pls.' Counsel for Att'ys Fees and Costs (Docket No. 145)) ("Defs.' Opp'n"), is simply un-

helpful. If anything, the instant litigation was significantly different from *Brewster v. Dukakis* to which Defendants refer the court for comparison. There, Plaintiffs report, all litigation was suspended within six months of the complaint, there was no formal discovery, depositions or experts, and few documents were in issue. Moreover, Plaintiffs assert, no trial was ever contemplated in *Brewster* nor was there formal mediation as there was here. At bottom, the court does not believe that Plaintiffs overstaffed the litigation and no reduction will be made on the basis of that objection alone.

### C. *Time on Tasks*

Quoting *Wilcox v. Stratton Lumber, Inc.*, 921 F.Supp. 837, 847 (D.Me.1996), Defendants next argue that "Plaintiffs' counsel spent 'an excessive amount of time' on discrete tasks in this matter[ ] and ... devoted an alarmingly high number of hours' to non-productive disputes with opposing counsel 'on collateral or tangential issues.' " (Defs.' Opp'n at 11.) Perhaps the most significant aspect of Defendants' argument concerns Plaintiffs' decision to seek fees for work commencing well before the lawsuit was filed in October of 1998, including fees for pre-filing settlement work. It is to this pre-filing issues, therefore, that the court first turns its attention. The court will then address Defendants' contention that there was an unwarranted duplication of effort.

#### 1. *Pre-filing Efforts*

There is little doubt that some of the services performed before a lawsuit is formally commenced may be deemed to have been spent "on the litigation" and therefore included in the calculation of a lodestar. *Webb v. Bd. of Educ. of Dyer County, Tenn.*, 471 U.S. 234, 243, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (in turn construing section 1988)). The "[m]ost obvious examples are the drafting of the initial pleadings and the work asso-

ciated with the development of the theory of the case." *Id.* However, in this court's estimation, it is not as easy here as it was in *Webb* —where five years of work on prior administrative proceedings was "easily separated from the two years of work thereafter," *id.*—to find the appropriate starting time. At best, Plaintiffs' pre-filing efforts can be divided into three distinct periods, each of which will be described and analyzed before the court discusses pre-suit settlement issues.

#### (a) *The Pre–Filing Time Periods*

The first time frame concerns activities engaged in by Plaintiffs' counsel prior to September 1, 1997, including their making a formal request for information from the Department of Mental Retardation ("DMR"). Plaintiffs estimate that between fifty and one-hundred hours was spent during this period. These hours are not reflected in the records provided to the court because Plaintiffs have voluntarily omitted any claim for such time from their fee request.

The second time period, September 1, 1997 through February 28, 1998, has two components. The first component stretches from September 1 through November 30, 1997, during which Plaintiffs' representatives claim to have analyzed all available information about persons with mental retardation and other developmental disabilities in nursing facilities in Massachusetts, to have researched various legal claims and to have made an informed professional judgment about whether there were meritorious facts and legal claims for federal litigation.

The second component stretches from December 1, 1997, through February 28, 1998. At the beginning of this period, Plaintiffs' attorneys had a meeting with the DMR Commissioner, at which time Plaintiffs claim to have informed him that they intended to file a lawsuit over the ensuing months against Governor Cellucci, DMR and other state agencies if the issues with respect to specialized services and

community placement were not promptly addressed. Plaintiffs now assert that at the request of the DMR Commissioner they refrained from initiating any legal action until DMR could conduct a full review of this matter and discuss possible remedial action with other state agencies.

The third and final pre-filing time period spans March 1 to October 28, 1998, the day the action was filed. Plaintiffs state that throughout this period they moved forward with their plan to file a lawsuit, if an acceptable resolution was not achieved, by identifying potential individual and organizational plaintiffs, drafting a complaint, designing a remedy with the assistance of certain experts, and preparing a settlement agreement. Also during this period, DMR scheduled a series of meetings between various state agencies and Plaintiffs in the hope of reaching an agreement concerning the community placement schedule for certain nursing facility residents, particularly those for whom transfers to community settings had been recommended.

### (b) *Analysis*

■ Having reviewed the actual time records, the court will utilize March 1, 1998, as the appropriate starting point for its analysis of the particular pre-filing efforts expended by the Plaintiffs "on the litigation." In choosing March 1, 1998, the court rejects Defendants' argument that the October 28, 1998 filing date provides the appropriate demarcation and adopts what appears to be Plaintiffs' position.[5]

To be sure, March 1, 1998 was nearly eight months prior to filing suit and approximately two months prior to April 28, 1998, a date the court itself deemed a significant turning point. (*See* Docket No. 79 (discovery ruling establishing April 28, 1998, as the benchmark for work-product protection).) The court is now aware, however, that beginning March 1, 1998, Plaintiffs moved forward with their plan to file a lawsuit if an acceptable resolution was not achieved and began to identify potential claimants, to establish links with organizational plaintiffs, to draft the complaint and to design a comprehensive remedy. These are the types of activities which the Supreme Court recognized in *Webb* as meriting fees. While, with hindsight, some hours prior to March 1, 1998, might be attributable to the lawsuit, these were, at best, nascent efforts exploring possible legal claims. Such efforts, the court believes, were too attenuated to be considered part of the litigation. Only after March 1, 1998, as Plaintiffs themselves describe, did the litigation effort truly commence.

Before analyzing that effort, the court needs to ensure that all time prior to March 1, 1998, has in fact been eliminated from consideration. In this respect, it is necessary to make two observations. First, the court does not believe that Plaintiffs' five percent "reduction two" translates into the approximately five hundred hours prior to March 1, 1998, claimed to have been eliminated. As set forth in Table II, the five percent reduction was applied, at least in part, to hours which Plaintiffs already eliminated in "reduction one," namely, the hours of Ms. Schwartz, Ms. Griffin, Ms. Swedlow, Ms. Warren, Mr. Barouch, Mr. Schlaud and Mr. Mueller. The elimination of their hours brought the total number of hours claimed

---

5. As explained, Plaintiffs have eliminated from the court's consideration any time expended prior to September 1, 1997. In addition, Plaintiffs have attempted to voluntarily eliminate all time prior to March 1, 1998. In this regard, Plaintiffs assert that the five percent across the board reduction in Table II, the "reduction two" described earlier, eliminated approximately five hundred hours which they claim is "a *complete* elimination of all time by all Plaintiffs' counsel from Sep-

tember 1, 1997 – March 1, 1998, when they primarily engaged in fact investigation, legal research, organizing a litigation team, and drafting legal memos on the various causes of action." (Pls.' Mem. at 22 (emphasis in original).) Thus, from Plaintiffs' point of view, they have already eliminated all time expended during the first two pre-filing time periods described above and seek fees only from March 1, 1998, onward.

after "reduction one" to about 9,243. Thus, rather than eliminating approximately five hundred hours (10,011 less 9,511), as Plaintiffs calculate, they actually reduced only about four hundred and sixty-two hours (9,243 less 8,781), via "reduction two."

Second, the hours claimed to have been eliminated via "reduction two" do not constitute, as alleged, a *complete* elimination of time spent by counsel prior to March 1, 1998. Having undertaken its own review of the time sheets proffered, the court finds that the total number of hours spent prior to March 1, 1998, (less the 8.5 hours expended by Ms. Griffin which have been totally eliminated), actually amounts to approximately five hundred and sixty-two hours. Thus, even after reductions "one" and "two," Plaintiffs still seek fees for approximately one hundred hours expended prior to March 1, 1998 (562 less 462). These hours are distributed among Mr. Schwartz, Ms. Costanzo, Ms. Siebrecht, Mr. Laski, Mr. Belin and Ms. Eshgi.

To ensure the elimination of all hours prior to March 1, 1998, the court will deduct the one hundred extra pre-March 1, 1998 hours calculated above according to the representatives' proportional time spent on the matter prior thereto: five hours from Mr. Schwartz, forty-eight hours from Ms. Costanzo, forty-three hours from Ms. Siebrecht, one hour from Mr. Belin and three hours from Ms. Eshgi. Frank Laski's time, both before and after March 1, 1998, will be considered separately below.

### (c) *Pre-filing Settlement Efforts*

■ The court's choice of March 1, 1998, as a starting date does not mean that all of Plaintiffs' ensuing pre-filing efforts—particularly their settlement negotiations—were sufficiently related to the litigation to warrant fee shifting. As the Supreme Court has indicated, there are pre-filing services such as drafting pleadings and developing the theory of a civil rights case which "advance" the case and may be deemed to have been spent "on the litigation." *Webb*, 471 U.S. at 243, 105 S.Ct. 1923. In this respect, Justice Brennan, concurring in part in *Webb*, noted that prevailing parties may recover fees for time spent before the formal commencement of a case on matters such as "attorney-client interviews, investigation of the facts of the case, research on the viability of potential legal claims, drafting of the complaint and accompanying documents, and preparation for dealing with expected preliminary motions and discovery requests." *Id.* at 250, 105 S.Ct. 1923 (Brennan, J., concurring). Justice Brennan's list, together with the suggestions set forth in Justice Stevens' majority opinion, provides a useful guide.

Conspicuously absent from the discussion of pre-trial proceedings in *Webb*, however, are settlement negotiations. Nonetheless, Plaintiffs maintain, their pre-filing settlement efforts ought to be counted towards attorneys' fees. These efforts, Plaintiffs aver, "not only provided a valuable insight into the parties' respective positions, but, perhaps more importantly, . . . generated substantial information which was eventually used in the litigation and mediation." (Pls.' Mem. at 21.) Plaintiffs assert as well that such pre-filing discussions "also revealed the historical conflicts between executive agencies concerning their responsibility for classmembers, as well as the considerable but unsuccessful efforts to resolve these conflicts, particularly for persons with developmental disabilities." (*Id.*). All this, in Plaintiffs' estimation, enabled them to spend considerably less time in discovery and mediation once the lawsuit was filed.

Plaintiffs' assertions to the contrary, neither the majority opinion in *Webb* nor any of the other cases cited by Plaintiffs says anything specific about pre-filing settlement discussions. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *City of Riverside v. Rivera, supra; Woods v. Graphic Communications*, 925 F.2d 1195 (9th Cir.1991);

*Tomazzoli v. Sheedy,* 804 F.2d 93 (7th Cir.1986); *Dowdell v. City of Apopka, Fla.,* 698 F.2d 1181 (11th Cir.1983). Granted, Justice Brennan noted in his discussion in *Webb* that "negotiation with administrative officials may narrow disputes and sharpen issues in the very same way as settlement discussions held after the litigation begins." *Id.,* 471 U.S. at 251, 105 S.Ct. 1923. However, Justice Brennan's comments arise in that part of his opinion which dissents. Moreover, here, the parties' initial efforts at settlement not only predated the filing of the lawsuit, but failed as well.

As the court sees it, Plaintiffs proceeded on two pre-trial tracks. One track—the "settlement" track—sought an acceptable resolution short of suit for those individuals who later became members of the class, a resolution Plaintiffs' representatives pursued as part of their on-going responsibilities as organizational advocates. On this track, as Plaintiffs themselves describe, DMR scheduled numerous meetings between Plaintiffs' representatives and various state agencies in the hope of reaching an agreement. In contrast, the second track—the "litigation" track—required Plaintiffs to expend significant time "on the litigation," i.e., identifying claimants, honing legal theories and drafting pleadings.

■ Although the court believes that Plaintiffs should be properly compensated for their efforts on the litigation track, it is not convinced that their efforts on the settlement track either sharpened the issues or were cost-effective, Plaintiffs' arguments notwithstanding. Of the two core matters targeted by Plaintiffs in their pre-filing settlement efforts, the specialized services issue remained unsettled until the eve of the preliminary injunction hearing and the community placement issue was not settled until the eve of trial. Moreover, while pre-filing efforts at settlement may have been somewhat instructive at times, there is little evidence that they resulted in active litigation-related discovery. As described, Plaintiffs still had to undertake extensive discovery when the lawsuit commenced.

With the Supreme Court's decision in *Webb* as guidance, the court has slogged through Plaintiffs' time records and has determined the amount of hours each advocate spent between March 1 and October 28, 1998 on both litigation and non-litigation, settlement activities. This, of course, has not been done with precision. Often, the identification of individuals and their affiliations were not readily apparent to the court. On other occasions, Plaintiffs' representatives' time sheets meld litigation and non-litigation activities. Nevertheless, the time records sufficiently distinguish litigation activities from settlement efforts to enable the court to make the following calculations.

Of the approximately one hundred and fifty hours reflected in Mr. Schwartz's time records between March 1 and October 28, 1998, about eighty were spent in litigation—as distinct from settlement—activities. Mr. Schwartz, it appears, spent a greater percentage of his time on settlement negotiations than Plaintiffs' other representatives. Accordingly seventy hours will be eliminated from his time records.

Ms. Costanzo, on the other hand, spent most of her approximately four hundred hours between March 1 and October 28, 1998, on litigation activities. Still, as best the court can calculate from her time records, at least one hundred and forty of those hours were spent on settlement activities and will therefore be deducted from the hours she claims.

Even fewer hours were spent on settlement matters by Ms. Siebrecht during this same period. It appears that the bulk of her time in this period, totaling approximately three hundred seventy hours, was spent on client contact, investigation and document preparation. Unfortunately, her records often fail to specify the subject matter of her frequent contacts with co-counsel. As best can be determined, the

court attributes seventy of Ms. Siebrecht's hours towards pre-filing settlement activities and has deducted that amount from her claimed total. The few hours spent during this same period by Mr. Engel, Ms. Siebrecht's DLC co-counsel, appear to be entirely litigation-related.

As to the team from FH & E, the court has determined the following hours to be non-litigative during this same time period: forty-four of the approximately eighty-two hours spent by Mr. Belin; sixty of the approximately one hundred and eighty spent by Ms. Eshgi; and the thirty transitional hours spent by Mr. Poret from September 28 through October 28, 1998. Accordingly, the court will deduct those hours from the award.

### 2. *Duplication*

■ The First Circuit explains that where more than one lawyer represents the prevailing party, all attorneys' contributions must be taken into consideration and the award should reflect all those efforts, but only "to the extent that the time reported does not reflect duplication of effort or work that would be performed by nonlawyers." *Reynolds v. Coomey*, 567 F.2d 1166, 1167 (1st Cir.1978). *See also Lipsett*, 975 F.2d at 938 ("A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism."); *Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir.1986) ("the time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted'" quoting *King*, 560 F.2d at 1027). In this vein, Defendants argue that, even when considering Plaintiffs' voluntary elimination of certain hours, much of the time reported—both prior to and after October 28, 1998—was duplicative. Unfortunately, the only concrete example proffered by Defendants is Mr. Belin's avowal that he consulted on virtually all significant matters of legal strategy with other members of the core litigation team, edited sections of major briefs and reviewed and edited other sections of briefs drafted by

his associates or other members of the team. (*See* Pls.' Exhibits, Vol. III, Ex. 30 ¶ 8.) Since this lone reference is hardly enough to demonstrate inappropriate duplication, the court has had to undertake a more searching review on its own.

While the court has found that the number of individuals representing Plaintiffs was appropriate, that same number created some inefficiencies, particularly given the attorneys' varying levels of experience. For example, it appears that, at times, more than the necessary number of attorneys participated in conferences. At other times, the coordination among Plaintiffs' representatives required excessive consultations. At still other times, more time than necessary was spent on research, redrafting and analysis. Accordingly, it is incumbent upon the court to pare redundant hours.

By way of example, Mr. Schwartz spent seven hours revising and editing the fifth and sixth drafts of the complaint on May 6, 1998, after Ms. Costanzo spent dozens of hours working on various drafts. Ms. Constanzo then spent many more hours— five on June 24, 1998, five and one-half on July 10, 1998—polishing the text. Other attorneys spent still more time on this same task. By way of further example, the court points to the work of two associates who appear to have conducted extensive research and to have drafted internal memoranda in areas of law which the four lead attorneys were no doubt quite knowledgeable. Finally, the time records are replete with instances of excessive conferencing among the various advocates.

The court's analysis of the record is not meant to be critical of Plaintiffs' representatives' efforts. As explained, the case presented novel issues of law for a large class of heretofore invisible people for whom much relief has been achieved. The problem, rather, is the nature of the undertaking of public advocates and their private allies who, in many ways, are not subject to the forces of the marketplace

during the course of litigation when fees might only be available at its conclusion.

■ Of course, the very purpose of the CRAFAA is to encourage and award legal advocacy on behalf of those unable to afford counsel, *see Del. Valley Citizens' Council,* 483 U.S. at 738, 107 S.Ct. 3078 (Blackmun, J., dissenting) (citing legislative history), and the court's analysis is not designed to discourage such efforts in any way. In addition, "public" attorneys are to be compensated on the same basis as "private" practitioners. *Reynolds,* 567 F.2d at 1167. Still, as the Supreme Court has explained, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. Stated another way, billing judgment is as important a component in the public sector as the private sector such that "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Id.* (citations and internal quotation marks omitted).

■ Even after considering the hours voluntarily eliminated by Plaintiffs, the court's review of Plaintiffs' representatives' time records convinces it that a ten percent reduction needs to be made for duplication. Granted, the court's reduction is not based on an hour-by-hour comparative analysis of Plaintiffs' fee request. The First Circuit does not require such scrutiny. *See Metropolitan Dist. Commission,* 847 F.2d at 16; *Jacobs v. Mancuso,* 825 F.2d 559, 562 (1st Cir.1987). *See also New York State Ass'n for Retarded Children, Inc.,* 711 F.2d at 1146 (district judge acted "within his discretion where he chose to make percentage reductions in response to defendants' detailed claims that the fee application contained excessive and duplicative hours"). Rather, the court believes that a ten percent across the board reduction adequately eliminates the duplication

that it has discovered, examples of which are described above. Such a modest reduction for duplication is well within the court's discretion. *See, e.g., Weinberger v. Great N. Nekoosa Corp.,* 801 F.Supp. 804, 819 (D.Me.1992) (disallowing eighty percent of duplicative time spend), *aff'd sub nom. BTZ, Inc. v. Great N. Nekoosa Corp.,* 47 F.3d 463 (1st Cir.1995); *Mokover v. Neco Enterprises, Inc.,* 785 F.Supp. 1083, 1089 (D.R.I.1992) (reducing similar charges by twenty percent). *See also Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir.1980) (en banc) (endorsing twenty-two percent cut). If anything the reduction is counterbalanced by the court's decision, explained below, to maintain one hourly rate per advocate for both core and non-core work.

## D. *Hourly Rates*

In opposition to the hourly rates claimed by Plaintiffs' advocates—ranging from a high of $315 for Mr. Belin, an attorney, to a low of $50 for Ms. Eddy, a paralegal— Defendants next make three assertions: (1) that some adjustment should be made to rates over the two year course of litigation; (2) that different rates should be applied to core and non-core work; and (3) that each rate sought is excessive.

■ As to the first assertion, the court is content to award rates appropriate to the moment of the fee request, rather than calculating various rates over the course of time. *See Ramos,* 713 F.2d at 555 (awarding current rates approximates periodic compensation adjusted for inflation). The litigation extended over a relatively short period and the current rates may well be offset by some future delay in payment. *See Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (holding that "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute").

Regarding the issue of differential rates, the First Circuit has made clear that a court has discretion to employ either a unified rate for all legal activities or a differential rate for core and non-core activities. *See Brewster v. Dukakis*, 3 F.3d 488, 492 (1st Cir.1993); *Maceira v. Pagan*, 698 F.2d 38, 40–41 (1st Cir.1983) (citing cases). Here, for several reasons, the court will apply unified rates. For one thing, the instant litigation does not present a clear line between core and non-core efforts; the effort expended was fairly consistent over the course of the litigation, more so than had a trial ensued. Moreover, to the extent that certain motion practice, discovery, mediation and other pre-trial activities may have been less demanding than trial efforts, the court has addressed those issues, at least in part, by reducing the rates claimed. Finally, given the general consistency of effort, the court does not find it necessary to overly scrutinize the time sheets to apply varying rates.[6]

Defendants' third assertion, that the hourly rates sought are excessive, is also flawed. For example, although Defendants refer to the rates applied to the work of Mr. Schwartz and Ms. Costanzo by other courts, *see, e.g., Brewster*, 3 F.3d at 492 (granting Mr. Schwartz $120 per hour for core legal work and Ms. Costanzo $80 per hour for such work), Defendants' objections lack the particularity and specificity called for by the First Circuit, *see Domegan*, 972 F.2d at 421 n. 35; *Rogers*, 821 F.2d at 30. Moreover, Defendants, without explanation, propose non-core rates which vary from sixty to sixty-four percent of core rates suggested for particular attorneys. Defendants also ignore the issue of rates with respect to Mr. Engel, Ms. Eshgi and Mr. Poret, preferring instead to eliminate entirely those advocates' efforts from the equation. Accordingly, the court is left to its own devices.

The court's selection of hourly rates is based in particular on the affidavit of Allan G. Rodgers, the executive director of the Massachusetts Law Reform Institute, even though the rates suggested by him might have since increased. (*See* Pls.' Exhibits, Vol. III, Ex. 36.) The court has also taken into account the stated experience of each advocate. In addition, the court believes that some downward adjustment in the claimed rates is appropriate given that the bulk of the advocates' efforts were out-of-court. As a result, the court has applied the following hourly rates to the following attorneys: $250 for Mr. Schwartz, $180 for Ms. Costanzo, $240 for Mr. Belin, $90 for Mr. Poret and $100 for Ms. Eshgi. In choosing these rates, the court has not entered the fray as to whether "Boston" or "Springfield" rates apply; the varying "core" rates offered by the parties vary insignificantly.

With regard to Mr. Engel, the court will apply an hourly rate of $170, not the $210 he requests. To be sure, an organizational chart recently developed by the DLC reflects a 1999 hourly rate of $210 for him. However, as Mr. Engel acknowledges, this court allowed him attorney's fees at a requested rate of $170 as recently as November 19, 1999. *See Adam R. v. Chicopee Public Schools*, Civil Action No. 99–30048–KPN (Mem. and Order, Nov. 19, 1999). While that rate may be less than what Mr. Engel could reasonably claim, as he now asserts, it was in fact the rate requested at just about the time the instant matter was concluded.

As to Ms. Siebrecht, another DLC attorney, the court believes that the reduction of Mr. Engel's hourly rate from $210 to $170 necessitates a reduction of her hourly rate. Unlike Mr. Engel, who has thirteen years of experience, Ms. Siebrecht has only three. Accordingly, Ms. Sie-

---

6. Interestingly, Defendants have not undertaken such scrutiny either. They simply suggest, without support or further explanation, even-numbered divisions between core and non-core hours of only four attorneys and one paralegal.

brecht's claimed rate of $120 will be reduced to $100 per hour.

 Regarding the three non-attorneys, the court is mindful that "[t]he efficient use of paralegals is, by now, an accepted cost-saving device." *Lipsett,* 975 F.2d at 939. As to Ms. McLaughlin, an experienced paralegal with FH & E, the court will apply an hourly rate of $100. As to Ms. Eddy, however, her claimed hourly rate of $50 will be cut in half. Not only did Ms. Eddy fail to keep contemporaneous time records, (*see* above at III(A)), it appears that her position as a "paralegal" was as much educational as it was employment-related. Ms. Eddy worked at CPR from February until mid-August of 1999 while on a leave of absence from Yale College because she was "particularly interested in using [her] research and computer skills to obtain a range of diverse experiences in a variety of contexts." (Pls.' Exhibits, Vol. III, Ex. 38 ¶ 1.) The court will apply the same $25 hourly rate to Ms. Stockwell, who is described as a "student intern" with FH & E with a "billing rate" of $65 per hour.

### E. *Frank Laski*

Defendants suggest that this court defer its ruling with respect to Mr. Laski, MHLAC's executive director, for whom fees of $90,864 are claimed. The court agrees. As both sides acknowledge the propriety of awarding fees to MHLAC state agency, is currently under consideration by the Massachusetts Supreme Judicial Court ("SJC"). *See Kadlick v. Department of Mental Health,* (SJC No. 08212). Since the court cannot predict the parameters of the SJC's ruling, it defers its own with respect to Mr. Laski. Accordingly, Mr. Laski's requested fees have been eliminated from the court's final calculation.[7]

### F. *Fee Calculations*

The court's attorney fees calculations can be summarized as follows:

| Advocate (Claimed Hours) | Deductions | Hours Allowed | Hourly Rate | Amount Due |
|---|---|---|---|---|
| Mr. Schwartz (1250.9) | −5; −70; then −10% | 1058.3 | $ 250 | $264,575 |
| Ms. Costanzo (1922.5) | −48; −140; then −10% | 1561.1 | 180 | 280,998 |
| Ms. Eddy (757.2) | −378.6; then −10% | 340.7 | 25 | 8,518 |
| Ms. Siebrecht (1939.9) | −43; −70; then −10% | 1644.2 | 100 | 164,420 |
| Mr. Engel (368.8) | −10% | 331.9 | 170 | 56,423 |
| Mr. Belin (564.1) | −1; −44; then −10% | 467.2 | 240 | 112,128 |
| Ms. Eshgi (202.9) | −3; −60; then −10% | 125.9 | 100 | 12,590 |

7. Of course, if the SJC rules that attorneys fees are payable to MHLAC, the parties to the case at bar may be able to agree upon the amount payable, in light of this opinion, before returning, if appropriate, for further consideration.

| Advocate (Claimed Hours) | Deductions | Hours Allowed | Hourly Rate | Amount Due |
|---|---|---|---|---|
| Mr. Poret (546.1) | −30; then −10% | 464.5 | 90 | 41,805 |
| Ms. McLaughlin (368.5) | −10% | 331.7 | 100 | 33,170 |
| Ms. Stockwell (541.4) | −10% | 487.3 | 25 | 12,183 |
| | | ***Total Fees*** | | **$986,810** |

### G. *Costs and Expenses*

Finally, Defendants assert that Plaintiffs' request for $178,430 in costs and expenses is excessive and suggest that only $80,000 be awarded. Defendants, however, provide no specifics as to how that amount has been calculated.

█ After poring over Plaintiffs' request, the court finds that they are entitled to costs and expenses of $125,361. In reaching this figure, the court has eliminated $43,935 from the request for the following expenses which it believes are part of an organization's overhead: document assembly ($84); telephone calls ($2,398); travel, transportation and parking ($9,467); supplies ($1,692); postage and mail delivery ($4,341); facsimile use ($5,470); computerized research ($1,138); meals and conferences ($1,748); and in-house copying ($17,597). In addition, the court has studied the supporting documentation regarding CPR's expert expenses, (*see* Ex. 21 (experts)), and found that the proper figure is $6,672, not the $15,807 which Plaintiffs claim.

The court finds all other expenses, including expert fees, reasonable and payable in full. In this regard, Defendants' conclusory claim that Plaintiffs' "use of eight experts was unnecessary, duplicative, and excessive for a matter that was marked down for a two-week trial," (Defs.' Opp'n at 10), is unhelpful. Defendants offer no evidence, other than speculation, as to how many experts might have been appropriate. In contrast, Plaintiffs convincingly demonstrate that they had to assemble, on short notice, a sufficient panel of experts to assess a statistically significant sample of class members, nearly sixty, to meet their burden of proof. These experts had to be qualified to give reports about the ability of various class members to live safely and to benefit from active treatment and community living as well as the ability of the existing system to serve them appropriately. In addition, it appears to have been necessary to include a doctor and several nurses, as well as disability community specialists in light of the medical necessity standards of the Medicaid program. In short, the unique facts of this case demonstrate that fewer experts would not necessarily have been more efficient, more productive or less time consuming.

As with Plaintiffs' use of experts, the court believes that the many depositions were neither duplicative nor excessive. Less thoroughly prepared lawyers would not have been as successful as Plaintiffs' advocates were here. *See Dowdell,* 698 F.2d at 1191 ("Attorneys' fees and expenses are awarded not only to make it possible for non-affluent litigants to obtain legal representation, but to reward attorneys whose services has benefitted the

public interest."). Defendants' arguments to the contrary, the central issues in this case went well beyond the interpretation of statutes and regulations.

In light of these findings, the costs and expenses payable break down among the three litigating entities as follows: CPR: $60,078 ($92,694 claimed less $23,481 attributable to overhead and $9,135 attributable to the mistaken expert expenses); DLC: $63,506 ($67,083 claimed less $3,577 attributable to overhead); and FH & E: $1,777 ($18,654 less $16,877 attributable to overhead); for a total of $125,361.

## IV. *CONCLUSION*

For the foregoing reasons, Plaintiffs are entitled to attorneys fees in the amount of $986,810 (of which $440,000 is apparently in the process of being paid (*see* n. 2 supra)) and costs in the amount of $125,361 (of which $80,000 is apparently in the process of being paid (*see* n. 2 supra)). A separate order shall issue indicated that all fees and costs should be paid forthwith. That part of Plaintiffs' motion which seeks fees for Mr. Laski is deferred and Plaintiffs will have thirty days from the SJC's ruling in *Kadlick* to file a notice with this court as to whether an agreement has been reached with respect to his fees or whether Plaintiffs still seek the court's ruling on Mr. Laski's request.