**Loretta ROLLAND, et al., Plaintiffs**

**v.**

**W. Mitt ROMNEY, et al., Defendants**

**No. CIV.A. 98–30208–KPN.**

United States District Court, D. Massachusetts.

Nov. 20, 2003.

24. Sonnenreich Dep. at 206–08.

25. *Id.*

Richard D. Belin, Foley Hoag LLP, Boston, MA, Cathy E. Costanzo, Matthew Engel, Northampton, MA, Nima R. Eshghi, Hale & Dorr Legal Services Center of Harvard Law School, Jamaica Plain, MA, Christine M. Griffin, Frank J. Laski, Boston, MA, Steven J. Schwartz, Northampton, MA, Stacie B. Siebrecht, Boston, MA, for Plaintiffs.

Kristi A. Bodin, Office of Attorney General, Springfield, MA, Rosemary S. Gale, Attorney General's Office, William W. Porter, Attorney General's Office, Ginny Sinkel, Attorney General's Office, Boston, MA, for Defendants.

James E. Breslauer, Lawrence, MA, Phillip Kassel, Daniel S. Manning, Boston,

MA, J. Paterson Rae, Springfield, MA, John Reinstein, Allan G. Rodgers, Boston, MA, for Interested Parties.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFFS' MOTION FOR FOURTH AWARD OF ATTORNEYS' FEES AND COSTS (Document No. 357)*

NEIMAN, United States Magistrate Judge.

Presently before the court is Plaintiffs' request for attorneys' fees totaling $923,869 plus costs. Defendants do not oppose the request for costs but do contend that the court should award no more than $546,892 in fees. Defendants assert, in part, that hours claimed for "monitoring" implementation of the parties' settlement agreement, as opposed to "enforcement litigation" in which Plaintiffs prevailed, are not compensable after the Supreme Court's decision in *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Defendants also assert that the hours claimed by Plaintiffs are excessive.

For the reasons which follow, the court will award Plaintiffs $781,496 in fees. It will also accept the parties' agreement with regard to the amount Plaintiffs should receive in costs.

I. BACKGROUND

The history of this litigation is best understood through the court's rulings on Plaintiffs' first two motions for attorneys' fees. *See Rolland v. Cellucci*, 151 F.Supp.2d 145 (D.Mass.2001); *Rolland v. Cellucci*, 106 F.Supp.2d 128 (D.Mass.2000). Of more recent vintage is Plaintiffs' third motion for fees filed on August 27, 2002, which covered the period from January 1 through May 31, 2001. By its own terms,

the third request, which sought $71,122, was limited to "monitoring" activities. It did not include efforts related to litigation during that same time period, in particular Plaintiffs' motion for injunctive relief.

Just prior to Plaintiffs' third motion for fees, Defendants filed an appeal of the court's May 3, 2002 order regarding active treatment, among other matters. Given the pendency of the appeal and urging the court to avoid a piecemeal approach, Defendants moved to strike Plaintiffs' third motion for fees as premature. The court denied Defendants' motion and required that they supplement their opposition to Plaintiffs' fee request.

Soon after the fee issue was joined, however, Defendants' appeal was heard by the First Circuit Court of Appeals. On January 28, 2003, the Court of Appeals affirmed this court's decision. *See Rolland v. Romney*, 318 F.3d 42 (1st Cir.2003). Soon thereafter, this court, having not yet ruled on Plaintiffs' third motion for fees, indicated its preference to address the issue of fees, by then no doubt growing, in one proceeding. Accordingly, the court denied Plaintiffs' third motion for fees without prejudice and ordered that they file a new application covering both calendar years 2001 and 2002. It is that application which is presently before the court.

Several points should be noted before discussing the merits of Plaintiffs' motion. First, as indicated, the parties have reached agreement on the costs to be reimbursed by Defendants. Second, in an effort to resolve as much of the motion as possible, the parties have agreed upon the hourly rates which apply.[1] Third, Plaintiffs' fee request includes time expended in response to Defendants' appeal. A request for such fees was filed with the

Court of Appeals with a suggestion that it be remitted to this court. Defendants formalized that suggestion in a motion, granted by the Court of Appeals on May 15, 2003. Hence, it is this court's responsibility to address fees claimed by Plaintiffs for both appellate and non-appellate work from January 1, 2001, through December 31, 2002.

## II. DISCUSSION

Defendants argue that, under *Buckhannon*, Plaintiffs are not entitled to fees for activities related to monitoring the settlement agreement. In addition, Defendants contend that the total number of hours claimed by Plaintiffs—3,491 hours allocated amongst seven attorneys and 1,905 paralegal hours—is out of proportion to the activity in the case during the two years at issue. In essence, Defendants claim that Plaintiffs seek very close to the amount awarded on their first fee application, $986,810, for a much narrower range of activity. Because of its import, Defendants' *Buckhannon* argument will be addressed first.

### A. FEES FOR MONITORING

In their third fee request (which is now part of the consolidated request), Plaintiffs sought fees in the amount of $71,122 exclusively for time from January 1 through May 31, 2001, devoted to monitoring implementation of the settlement agreement. Although Plaintiffs do not break out such "monitoring" in their fourth request for fees—for the period of June 1, 2001 through December 31, 2002—their latest request no doubt includes additional time for such activities.

---

1. The agreed upon rates are as follows (compared in parentheses to the rates previously utilized by the court): Schwartz $275 ($250); Costanzo $205 ($180); Engel $205 ($170); Laski $275 ($250); Belin $257.50 ($240); Toner $160 (no previous rate); Hatrick $120 (no previous rate); Boundy $75 ($30); and McLaughlin $100 ($100).

Defendants argue that monitoring is not compensable because Plaintiffs are not "prevailing parties" as to such work under *Buckhannon. See id.*, 532 U.S. at 604, 121 S.Ct. 1835 (limiting "prevailing party" status to those who succeed in obtaining an "enforceable judgment[ ] on the merits [or a] court-ordered consent decree"). Defendants maintain that the Supreme Court specifically declined to extend prevailing party status to settlements that "do not entail the judicial approval and oversight involved in consent decrees." *Id.* at 604 n. 7, 121 S.Ct. 1835.

This is the first time this court has had an opportunity to fully address *Buckhannon.* As the parties are aware, *Buckhannon* was decided on May 29, 2001, well after this court made its first award of fees on June 8, 2000. In any event, the parties had stipulated in their settlement agreement that Plaintiffs were entitled to reasonable fees for all work performed prior to the settlement. *See Rolland,* 106 F.Supp.2d at 131. Similarly, the parties did not have an opportunity to address *Buckhannon* before Plaintiffs' second motion for fees was decided by the court on July 23, 2001. *See Rolland,* 151 F.Supp.2d at 155 n. 4. Still, the parties agreed, at that time, that reasonable post-settlement monitoring efforts were compensable. *Id.* at 153.

In opposing Plaintiffs' present motion, however, Defendants have done a volte face. In essence, they no longer concede that Plaintiffs' post-settlement monitoring is compensable. Rather, they argue that, under *Buckhannon,* Plaintiffs cannot be deemed prevailing parties with respect to such work. In other words, Defendants assert that neither the three hundred plus hours claimed for monitoring in Plaintiffs' third request for fees nor any monitoring hours included in the present, fourth request, should be compensated as a matter of law.

Broadly speaking, *Buckhannon* rejected the catalyst theory as a basis for obtaining attorneys' fees. *See Richardson v. Miller,* 279 F.3d 1, 4 (1st Cir.2002) ("[W]e are constrained to follow the Court's broad directive [in *Buckhannon* ] and join several of our sister circuits in concluding that the catalyst theory may no longer be used to award attorney's fees under the [Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988].") As Defendants point out, the Court drew a distinction between "judgments on the merits" or "settlement agreements enforced through a consent decree," where attorneys' fees are compensable, and catalytic success without any "judicially sanctioned change in the legal relationship of the parties," where attorneys' fees are not compensable. *Buckhannon,* 532 U.S. at 604–05, 121 S.Ct. 1835.

The implications of Defendants' arguments to the contrary, there is little doubt that the parties' settlement agreement here is judicially enforceable. First, the agreement itself provides for such enforcement. *See Rolland,v. Cellucci,* 191 F.R.D. 3, 8 (D.Mass.2000) (describing enforcement process of the settlement agreement). Second, in accord with its terms, the settlement agreement was approved and entered as a court order following a fairness hearing. *See id.* at 15–16. Many courts since *Buckhannon* have consistently allowed attorneys' fees in similar contexts. *See, e.g., Richard S. v. Dep't of Developmental Services,* 317 F.3d 1080, 1086–87 (9th Cir.2003); *Truesdell v. Philadelphia Housing Auth.,* 290 F.3d 159, 165–66 (3d Cir.2002); *American Disability Ass'n, Inc. v. Chmielarz,* 289 F.3d 1315, 1320–21 (11th Cir.2002).

■ To be sure, as Defendants point out, paragraph twenty-seven of the settlement agreement precludes its direct enforcement by an action for contempt or breach of contract. Pursuant to para-

272

graph thirty-two, however, the court can—and, indeed, did—enforce its provisions through injunctive and other relief. This is more than enough to make the agreement judicially enforceable. *See Roberson v. Giuliani*, 346 F.3d 75, 83 (2d Cir.2003) ("[E]ven if ... a court [is precluded] from using its contempt power in the first instance to enforce a private settlement agreement over which it has retained jurisdiction, we do not think this is significant enough to deprive plaintiffs of prevailing party status."). Moreover, there is no question that the court has the power to enforce by contempt any post-settlement judicial orders. *See generally Rolland v. Romney*, 273 F.Supp.2d 140 (D.Mass. 2003). *See also Root v. Woolworth*, 150 U.S. 401, 412, 14 S.Ct. 136, 37 L.Ed. 1123 (1893) ("Where the court possesses jurisdiction to make a decree, it possesses the power to enforce its execution."); *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 282 (4th Cir.) ("A court's responsibility to ensure that its orders are fair and lawful stamps an agreement that is made part of an order with judicial imprimatur, and the continuing jurisdiction involved in the court's inherent power to protect and effectuate its decrees entails judicial oversight of the agreement."), *cert. denied*, 537 U.S. 825, 123 S.Ct. 112, 154 L.Ed.2d 35 (2002).

In any event, Defendants' argument to the contrary, *Buckhannon* did not directly address the compensability of post-settlement monitoring, the issue at hand. This court, however, has had occasion to consider the matter. In response to Plaintiffs' second fee request, the court determined that monitoring, as the parties stipulated at the time, was in fact compensable. *See*

*Rolland*, 151 F.Supp.2d at 153–54. Even so, the court drew a distinction between "monitoring" and "enforcement." *Id.* The court decided that post-settlement "enforcement" efforts, to be compensable, had to be successful as well. *Id.* at 154–55. *See also Cody v. Hillard*, 304 F.3d 767, 773 (8th Cir.2002) (holding that post-judgment work "that is more like a new, separate lawsuit requires a fresh determination of entitlement to fees") (citation and internal quotation marks omitted). At bottom, the court stated,

as long as Plaintiffs pursue matters without court intervention, their reasonable [monitoring] efforts may be compensated. If they seek court intervention via a paragraph thirty-two motion and prevail, that effort too is compensable. If, however, Plaintiffs unsuccessfully seek such court intervention, that effort is not compensable, particularly when it does not present "a common core of facts" to successful claims independently pursued.

*Rolland*, 151 F.Supp.2d at 155 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435–36, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).[2]

In opposing Plaintiffs' current request for fees, Defendants concede that Plaintiffs' successful "enforcement" activities, as so defined, are compensable. Plaintiffs, in fact, were successful in enforcing the settlement agreement in calendar years 2001 and 2002, not only when they sought relief from this court, *see Rolland v. Cellucci*, 138 F.Supp.2d 110 (D.Mass.2001); *Rolland v. Cellucci*, 198 F.Supp.2d 25 (D.Mass. 2002), but when they successfully defended its ruling before the Court of Appeals, 318 F.3d 42 (1st Cir.2003). Nonetheless, Defendants maintain that Plaintiffs' "monitor-

**2.** Plaintiffs sought reconsideration of the line drawn by the court. *See Rolland v. Cellucci*, 164 F.Supp.2d 182 (D.Mass.2001). The court concluded, however, that Plaintiffs' motion to reconsider did not present a justiciable con-

troversy because they were not seeking a recalculation of the fees awarded, just a restyling of the court's reasons for the award. The court, therefore, denied the motion. *See id.* at 184–85.

ing" activities during this same time period cannot be compensated. The court does not agree.

For one thing, as mentioned, *Buckhannon* does not control the compensability of post-judgment monitoring efforts. In fact, the closest the Court came to discussing such efforts supports Plaintiffs', not Defendants', current position. Confirming the need to have a material alteration in the parties' legal relationship for one party to "prevail," the Court cited with approval the fee award in *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (8th Cir. 1970). *See Buckhannon,* 532 U.S. at 607 n. 9, 121 S.Ct. 1835. The Court pointed out that, like the consent decree in *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), the Eighth Circuit in *Parham* ordered the trial court to "retain jurisdiction over the matter for a reasonable period of time to insure the continued implementation of the [subject] policy." *Id.*

█ More to the point, paragraphs six, ten, eighteen, twenty-four and twenty-five of the settlement agreement specifically create a monitoring role for Plaintiffs. *See also Rolland,* 151 F.Supp.2d at 154. It would be anomalous, indeed, for Plaintiffs to be considered prevailing parties for purposes of achieving a settlement which materially altered the legal relationship of the parties, but denied such status for monitoring its terms as called for by the agreement itself. *See Cody,* 304 F.3d at 773 ("an earlier established prevailing party status extends to postjudgment work ... if it is a necessary adjunct to the initial litigation") (citation and internal quotation marks omitted). Under such circumstances, Defendants cannot reasonably expect such monitoring to be undertaken pro bono by Plaintiffs' counsel. Counsel for a certified class, together with the representative parties, have an obligation to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). That obligation, in the court's opinion, did not evaporate in the case at hand when the parties entered into their settlement. *See Association for Retarded Citizens of N. Dakota v. Schafer,* 83 F.3d 1008, 1010–11 (8th Cir. 1996) (holding that court may award fees to a prevailing class for reasonable post-judgment monitoring); Federal Judicial Center, Manual for Complex Litigation § 30, at 211–12 (3d ed. 1995) ("[A]ttorneys and parties seeking to represent the class assume fiduciary responsibilities and the court bears a residual responsibility to protect the interests of the class members, for which Rule 23(d) gives the court broad administrative powers.")

For all these reasons, monitoring is eligible for compensation, as is successful enforcement. The only limitation to compensability, of course, is reasonableness, *see Rolland,* 151 F.Supp.2d at 154, a concept which may vary over time.

B. *REASONABLENESS OF FEE APPLICATION*

Plaintiffs' fee application sets forth the total number of hours spent for both appellate and non-appellate work by each attorney and paralegal from January 1, 2001, through December 31, 2002.[3] The application also notes the time recorded by each representative for compensable activities, as well as time spent on matters which, based on their professional judgment, they have voluntarily "omitted" or "no charged." These voluntary reductions, Plaintiffs assert, are consistent with the

---

**3.** Plaintiffs' request for fees before the Court of Appeals itself amounted to $73,286, all of which concerned work done in 2002. The amount attributable to appellate work in Plaintiffs' fourth request for fees, however, is $72,164. (See Document No. 359, Exhibit 1.) Since the difference goes unexplained, the court will utilize the lower $72,164 figure in its analysis.

court's prior fee decisions and have resulted, all told, in an eleven percent deduction in the total time spent on the case. Plaintiffs also provide affidavits which describe each representative's experience and responsibilities during the time period at issue.

For their part, Defendants argue as a general proposition that Plaintiffs claim too much for fees. In particular, Defendants assert that, during the applicable time period, Plaintiffs confronted but a single core issue and that their efforts, accordingly, were out of proportion to those expended during the initial litigation period, which involved not only a wide-range of "benchmark" litigation, but mediation and settlement-related activities as well. Defendants therefore argue for a significant percentage reduction in the fees claimed.

The court believes this particular argument on Defendants' part is a bit too facile. For one thing, the court is not convinced that the two years presently at issue were as placid as Defendants suggest. In 2002, for example, there was, in addition to a significant monitoring effort, a five day trial and argument, eighteen witnesses, over one hundred exhibits, multiple pretrial motions, lengthy post-trial briefs, and a complex appeal before the First Circuit. Moreover, the court believes that it is best to address Plaintiffs' fee request in the usual manner, i.e., "by ascertaining the time counsel actually spent on the case and then subtract[ing] from that figure hours which were duplicative, unproductive, excessive or otherwise unnecessary." *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir.1992) (citation and internal quotation marks omitted).

The court, therefore, will turn to Defendants' more specific concerns, namely, that (1) much of the time expended by a particular paralegal, to the extent it was not excessive, should be classified as secretarial, (2) there was a significant duplication of effort on the part of Plaintiffs' representatives, and (3) Plaintiffs' counsel spent an excessive amount of time on research, drafting and editing. Before doing so, however, the court will describe Defendants' fee proposal and highlight a numerical inconsistency.

### 1. *Defendants' Fee Proposal*

Defendants' suggested fee of $546,892 is set out in Attachment A to their Memorandum in Opposition to Plaintiffs' Consolidated Third and Fourth Requests for Attorneys' Fees (Document No. 371). In arriving at this figure, Defendants not only take into account their specific concerns outlined above, but totally ignore the 334.25 hours for monitoring which Plaintiffs claimed in their third request for fees. By the court's calculation, this latter amount (using the agreed upon hourly rates) totals $62,590.25.

Should monitoring activities be deemed compensable, Defendants alternatively argue that the hours claimed by Plaintiffs, whether for monitoring or enforcement, are excessive and should be reduced. Having found monitoring compensable, the court assumes that Defendants would want the same percentage reduction applied to monitoring as they suggest be applied to Plaintiffs' other efforts. That process would revise Attachment A and somewhat increase Defendants' suggested fee to $587,635 as follows:

| | Hours Claimed | Percent Reduction | Net Hours | Rate | Lodestar |
|---|---|---|---|---|---|
| Schwartz | 909.40 | 15 | 773 | $275.00 | $212,575 |
| Costanzo | 1091.50 | 20 | 873 | $205.00 | $178,965 |
| Toner | 177.00 | 15 | 150 | $160.00 | $ 24,000 |
| Boundy | 1570.05 [4] | 75 | 393 | $ 75.00 | $ 29,475 |
| Engel | 277.95 | 60 | 111 | $205.00 | $ 22,755 |
| Laski | 292.10 | 35 | 190 | $275.00 | $ 52,250 |
| Belin | 145.50 | 60 | 58 | $257.50 | $ 14,935 |
| Hatrick | 597.95 | 60 | 239 | $120.00 | $ 28,680 |
| McLaughlin | 267.10 | 10 | 240 | $100.00 | $ 24,000 |

TOTAL: $587,635

Neither this revised fee nor Defendants' originally suggested fee, however, comports with Defendants' line-by-line analysis. Thus, even were the court to eliminate all the hours which Defendants assert are duplicative or excessive—as described in Exhibits A through H of Andrea H. Maislen's Affidavit—the total reduction would amount to $184,103.63. This is significantly less than either the $376,977 reduction which Defendants seek in their original Attachment A ($923,869 minus $546,892) or even the adjusted reduction of $336,234 as calculated by the court in the above chart ($923,869 minus $587,635). In other words, the percentage reduction suggested by Defendants results in a recommended fee of either $546,892 or $587,635, both of which are well below the $739,765.37 figure called for by Defendants' line-by-line analysis ($923,869 minus 184,203.63).[5] Despite this numerical confusion, Defendants have raised certain issues which the court believes necessitate a reduction in the fee award sought by Plaintiffs.

4. The court has taken this opportunity to reduce Ms. Boundy's claimed hours by 59.5 which Plaintiffs acknowledge was mistakenly included in her total.

5. The reason for the difference between the $739,765.37 figure and the $546,892 figure originally suggested by Defendants has not been explained by them. Nor can it be explained by Defendants having apparently disregarded the $24,922 for litigation-related travel and the $430 paralegal fee for Apostolos Exarchos included in Plaintiffs' fee application.

### 2. *Ms. Boundy*

Defendants argue that much of Ms. Boundy's time as a paralegal is for non-compensable secretarial work, while the remainder is excessive. In response, Plaintiffs assert that Ms. Boundy's efforts involved tasks well beyond secretarial duties and that she has already exercised billing judgment and reduced her fee claim by 126.3 hours. For its part, the court, having closely reviewed the record, does not believe that Plaintiff's voluntary reduction adequately reflects the excessive nature of much of Ms. Boundy's activities.

### 3. *Duplication*

Defendants also argue that there were frequent instances of duplication. To be sure, Plaintiffs claim to have deleted from their fee application a significant amount of time spent in conferences with colleagues, among other activities, in order to address this court's previously expressed concerns about duplication.[6] In total,

6. Ms. Costanzo, for example, describes the elimination of approximately thirty-two hours, including all communications with staff at the Center for Public Representation (with the exception of co-counsel Steven Schwartz and paralegal Marion Boundy). (See Costanzo Affidavit ¶ 3. See also Schwartz Affidavit ¶ 2 (describing, among other things, the elimination of twenty-five hours, including all communications with attorneys and support staff at the Center for Public Representation except Ms. Costanzo); Engel Affidavit ¶ 3 (describing the elimination of approximately fifty hours, including most of his time at the trial in November of 2001); Belin Affidavit

Plaintiffs assert, their representatives "omitted" eighty-one and "no charged" nearly six hundred hours, thereby eliminating, as described, approximately eleven percent of the total time spent. (See Document No. 359, Exhibit 1.)

 Nonetheless, the court finds significant duplication not addressed by Plaintiffs' voluntary reductions, particularly, excessive conferencing and consultations among Plaintiffs' counsel. As one example only, a 1.3 hour telephone conference call on June 6, 2001, has three attorneys claiming fees totalling $890.50. In the following three months alone, this approach is repeated at least three times in July of 2001, once in August, and three times in September. Ms. Constanzo's billing records in particular have a high number of telephone conferences.

Similarly, the court finds meritorious Defendants' challenge to Plaintiffs charging for a significant amount of time spent by their attorneys accompanying experts on tours of nursing facilities. For example, Defendants note that Plaintiffs seek fees of $31,625 for two attorneys who accompanied experts to nursing facilities on seven different days in July and August of 2001. In response, Plaintiffs assert that their representatives did not simply accompany experts. Rather, Plaintiffs maintain that their representatives spent time independently gathering facts, monitoring services for classmembers, speaking with nursing facility staff and reviewing records among other activities.

Plaintiffs' explanation to the contrary, their contemporaneous billing records, for the most part, simply mention "expert tour" or "tours of nursing homes," nothing else. Moreover, as Defendants argue and as this court previously observed, such activities "could have been done by a paralegal." *Rolland*, 151 F.Supp.2d at 157–58.

¶ 18 (describing elimination of hours spent

The court has little choice, therefore, but to deem most of these hours excessive.

### 4. *Research, Drafting and Editing*

Defendants next assert that Plaintiffs' counsel spent an excessive amount of time on research, drafting and editing. In response, Plaintiffs argue that Defendants' analysis is just another attack on Plaintiff's staffing and allocation of responsibilities, a concern which has previously been addressed by the court and, now, by Plaintiffs' eleven percent voluntary reduction.

The court is well aware of the significant effort entailed in both monitoring and enforcing the settlement agreement. But those efforts—impelled perhaps by a desire to ensure that the entire litigation team was up-to-date on all developments—have too often been excessive in many of the ways described by Defendants. As one example, Defendants point to Plaintiffs' request for $71,754 in fees for 597 hours spent by Ms. Hatrick, an associate at Foley Hoag. Ms. Hatrick, Defendants note, billed forty hours for supervising research assignments performed by summer associates in 2002, time which Defendants argue should be eliminated.

Defendants also challenge as duplicative most of the hours expended by Mssrs. Engle, Belin and Laski. For example, Defendants note that Mr. Engle seeks reimbursement in the amount of $56,980 (for 278 hours at $205 per hour) even though, as described by Plaintiffs' lead counsel, he "played a limited role in the monitoring phase of this case, attending meetings with DMR and researching active treatment requirements." (Schwartz Affidavit ¶ 4.) As to Mr. Belin, Defendants point out that, except for his preparation for and examination of one witness and the cross examination of another during the Novem-

with and by other members in his firm).)

ber 2001 evidentiary hearing, his time was often duplicative. Similarly, Mr. Laski devoted a substantial amount of time on general subjects in which Plaintiffs' other attorneys participated; his role in the litigation appears to have been largely consultative.

To be sure, the allocation of responsibility, as described by Plaintiffs, had the worthy goal of making their representatives' activities more efficient. The court is also appreciative of Plaintiffs' representatives' efforts to exercise billing judgment. However, the court does not believe that Plaintiffs' voluntary omission of certain hours adequately eliminated the excessive hours and duplication which a close analysis of Plaintiffs' time records reveals. *Compare Boulet v. Romney,* 2003 WL 1538374 at *2 (D.Mass. Mar. 24, 2003) (accepting as adequate plaintiff's voluntary fee reduction of over seven percent).

## C. *Application*

For the reasons explained, the court will apply a fifteen percent reduction to Plaintiffs' fee request, resulting in a total award of $781,496 as follows:

| | |
|---|---|
| Schwartz: | $219,734 |
| Costanzo: | 198,558 |
| Toner: | 24,072 |
| Boundy: | 100,846 [7] |
| Engel: | 51,465 |
| Laski: | 70,149 |
| Belin: | 31,846 |
| Hatrick: | 60,991 |
| McLaughlin | 23,469 |
| Exarchos | 366 |
| Total | $781,496 |

Such a modest reduction is well within the court's discretion. *See, e.g., Weinberger v. Great N. Nekoosa Corp.,* 801 F.Supp. 804, 819 (D.Me.1992) (disallowing eighty percent of duplicative time spent), *aff'd sub nom. BTZ, Inc. v. Great N. Nekoosa Corp.,* 47 F.3d 463 (1st Cir.1995); *Mokover v. Neco Enterprises, Inc.,* 785 F.Supp.

1083, 1089 (D.R.I.1992) (reducing similar charges by twenty percent). *See also Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir.1980) (en banc) (endorsing twenty-two percent cut).

## III. CONCLUSION

For the reasons stated, the court ALLOWS Plaintiffs' motion for fees in the amount of $781,496, plus such costs as have been agreed upon by the parties.

IT IS SO ORDERED.

---

**7.** This incorporates a reduction of 59.5 hours. *See* n. 4, *supra.*