**Loretta ROLLAND, et al., Plaintiffs**

v.

**Deval PATRICK, et al., Defendants.**

**Civil Action No. 98–30208–KPN.**

United States District Court,
D. Massachusetts.

June 16, 2008.

Cathy E. Costanzo, Matthew Engel, Steven J. Schwartz, Northampton, MA, Frank

J. Laski, Mental Health Legal Advisors Committee, Catherine H. Wicker, Jeffrey S. Follett, Foley Hoag LLP, Boston, MA, for Plaintiffs.

William W. Porter, David A. Guberman, Deirdre Roney, Attorney General's Office, Kenneth W. Salinger, Massachusetts Attorney General's Office, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO THE PARTIES' JOINT MOTION TO APPROVE SETTLEMENT AGREEMENT ON ACTIVE TREATMENT (Document No. 469)*

NEIMAN, United States Chief Magistrate Judge.

The instant class consists of individuals with mental retardation or other developmental disabilities who reside in nursing facilities and whose care is paid for by the Commonwealth under its Medicaid program. When this case was filed in 1998, there were approximately 1600 class members in nursing facilities. As of November 1, 2007, that population had been reduced to approximately 758 as a result of Defendants meeting community placement targets and diverting potential new class members from nursing facilities, all in accord with the original settlement agreement approved in January of 2000.[1]

Defendants, however, have had significantly less success ensuring "active treatment" to class members remaining in nursing facilities in accord with the original settlement. As a result, the parties, of late, have agreed that their efforts and resources would be better spent on achieving community placements for the majority of remaining class members, rather than continuing to struggle to meet the high standards of active treatment for nursing facility residents, scattered as they are among over 290 facilities statewide. Accordingly, on April 7, 2008, Plaintiffs and Defendants moved that the court approve their proposed Settlement Agreement on Active Treatment (Document No. 468, Ex. A., hereinafter "the Agreement"), with adjustments to several dates in paragraphs 23–24 thereof. The parties expect that by late 2012, in accord with the Agreement, there will remain a relatively small number of class members who will have stayed in nursing facilities for longer than ninety days and who will be receiving active treatment. The parties also assert that class members who remain in nursing facilities pending community placement will continue to receive current levels of specialized services.

Although the parties jointly urge the court to approve the Agreement, certain parents and guardians of class members at the Seven Hills Pediatric Center ("Seven Hills") (hereafter the "Groton parents"), have asked that the court reject it.[2] The

---

1. Prior decisions in this case include *Rolland v. Romney*, 318 F.3d 42 (1st Cir.2003); *Rolland v. Patrick*, 483 F.Supp.2d 107 (D.Mass. 2007); *Rolland v. Romney*, 292 F.Supp.2d 268 (D.Mass.2003); *Rolland v. Romney*, 273 F.Supp.2d 140 (D.Mass.2003); *Rolland v. Cellucci*, 198 F.Supp.2d 25 (D.Mass.2002); *Rolland v. Cellucci*, 164 F.Supp.2d 182 (D.Mass. 2001); *Rolland v. Cellucci*, 151 F.Supp.2d 145 (D.Mass.2001); *Rolland v. Cellucci*, 138 F.Supp.2d 110 (D.Mass.2001); *Rolland v. Cellucci*, 106 F.Supp.2d 128 (D.Mass.2000); *Rolland v. Cellucci*, 52 F.Supp.2d 231 (D.Mass.

1999); *Rolland v. Cellucci*, 191 F.R.D. 3 (D.Mass.2000); *Rolland v. Patrick*, 2007 WL 184626 (D.Mass. January 16, 2007); and *Rolland v. Cellucci*, 1999 WL 34815562 (D.Mass. Feb.2, 1999).

2. Seven Hills is a pediatric skilled nursing facility in Groton that, by its own description, "provides comprehensive, compassionate care to children and young adults who are severely developmentally delayed and have complex medical needs. Children at Seven Hills enter prior to their 22nd birthday and

Groton parents, it should be noted, have also moved to decertify the class, which motion is not yet ripe. Having considered the parties' and Groton parents' submissions and after hearing witnesses and arguments at the fairness hearing on May 22, 2008, the court, at the end of the hearing, approved the Agreement and hereby more fully memorializes its reasoning.

## I. STANDARD OF REVIEW

 According to Fed.R.Civ.P. 23(e)(2), a class action may be settled "only with the court's approval" and the court is required to determine whether a proposed settlement is "fair, reasonable and adequate." *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2 (1st Cir.1999) (citing *In re Gen. Motors Corp.*, 55 F.3d 768, 804–19 (3d Cir.1995)). The burden is on the proponents of a settlement to make this showing. *See Sylvester v. CIGNA Corp.*, 369 F.Supp.2d 34, 44 (D.Me.2005) (citing 7B Wright, Miller & Kane, *Federal Practice & Procedure: Civil 3d* § 1797.1 (2005)). Moreover, "[w]hen sufficient discovery has been provided and the parties have bargained at arms length, there is a presumption in favor of the settlement." *City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*, 100 F.3d 1041, 1043 (1st Cir.1996) (citing cases). In turn, the court's special responsibility to protect class members includes an evaluation of "whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interests of all those who will be affected by it." *Giusti–Bravo v. U.S. Veterans Admin.*, 853 F.Supp. 34, 36 (D.P.R.1993) (citations omitted). Finally, although the fairness process is most commonly invoked in lieu of a trial on the merits, *see generally Greenspun v. Bogan*,

492 F.2d 375, 381 (1st Cir.1974), the court believes it is equally relevant to a settlement reached, as is true here, after considerable time has been spent unsuccessfully implementing prior court-ordered remedies.

## II. BACKGROUND

As part of the parties' original settlement agreement in January of 2000, Defendants agreed to provide class members with specialized services. In May of 2002, however, the court found that Defendants had violated the settlement agreement by not ensuring that each class member receive active treatment, pursuant to federal law, in the provision of those services. As a result, through further orders in August and November of 2002, the court required Defendants to create a single plan for each class member (which Defendants call the "Rolland Integrated Service Plan" or "RISP") that described the individual's specialized services and provided for "carryover" of the services goals into the nursing facility.

Unfortunately, by April of 2007, the court found that Defendants still had not met their active treatment obligations, ordered the adoption of more particular standards and, in June, appointed a Court Monitor to review the care provided to each class member. With input from and with the agreement of the parties, the Court Monitor developed a detailed protocol for measuring active treatment. In her initial reviews, however, the Court Monitor found that Defendants' efforts did not come close to meeting active treatment standards. The proposed Agreement arose out of these developments.

traditionally remain throughout their lifetime." *See* http://www.sevenhills.org/shg.

html (last visited June 16, 2008).

Under the Agreement, Defendants will create and fill 640 new community placement slots for class members over the next four fiscal years (Agreement ¶¶ 4–21); continue current levels of specialized services, as well as provide individualized transition services, for class members awaiting community placement (*id.* ¶ 28); continue current diversion efforts and develop a corrective action plan if the number or rate of diversions falls off (*id.* ¶¶ 29–30); and provide "active treatment," as measured by the Court Monitor's protocol, for all class members who remain in nursing facilities at the end of the four years, as well as for class members who have been deemed unsuitable for community placement in the meantime (*id.* ¶¶ 24, 27). Nothing in the Agreement, the parties indicate, will require Defendants to force class members out of nursing facilities against their will.

The Agreement further provides that, in light of the increased emphasis on community placement, Defendants will not need to meet the active treatment standards presently reflected in the Court Monitor's protocol for class members who are on the community placement list and awaiting placement. (*Id.* ¶¶ 28, 61.) In addition, the role of the Court Monitor will be narrowed somewhat to a system of semi-annual reports and quarterly meetings. (*Id.* ¶¶ 31–37.) If, at the end of the four years, Defendants have in fact transitioned 640 class members from nursing facilities to the community and have implemented the recommendations of the Court Monitor to correct active treatment deficiencies for all remaining class members, the case will be dismissed. (*Id.* ¶¶ 33, 49–50.)

The court preliminarily approved the Agreement on April 14, 2008. Each class member was thereafter given notice of the proposed Agreement, in a form approved by the court, as well as the opportunity to submit written comments and to appear at a fairness hearing on May 22, 2008.

At the hearing, the court heard testimony from a number witnesses called by the parties, as well as from four of the Groton parents. The witnesses included Elin Howe (Commissioner of the Department of Mental Retardation ("DMR")), J.P. (a brother-in-law of a class member who had moved to a community residence), D.G. (a class member living in a community residence), Leo Sarkissian (Executive Director of the Association of Retarded Citizens ("ARC")), and four Groton parents (L.P., F.V., P.L. and T.R.). The court also considered the extensive memoranda filed by the parties, as well as the memorandum and letters submitted by the Groton parents. As indicated, the court approved the Agreement at the end of the hearing.

### III. DISCUSSION

The parties assert that, by its terms, the Agreement, which they reached after arms-length negotiations, will enhance services to class members as well as significantly increase the number of community settings where the needs of many of them could be better served. The court agrees. The Agreement, in the court's view, offers substantial improvement for all class members and provides a fair, reasonable and adequate approach to problems previously identified by the parties, the court itself, and the Court Monitor. The following discussion describes the manifold advantages of the Agreement, addresses the Groton parents' concerns, and offers some concluding thoughts.

### A. *The Agreement's Advantages*

■ First, the additional community placement opportunities and services for class members will likely exceed the services and incremental changes that would occur should individuals, for whom community placement is appropriate, remain in

nursing facilities. As the parties articulate, staff at community-based programs operated or funded by DMR receive special training in the provision of services to individuals with mental retardation or developmental disabilities. Community-based programs are also required to meet all the medical and nursing needs of residents and to have sufficient staff to support the delivery of habilitative services.

In contrast—aside from certain pediatric nursing facilities that specialize in caring for residents with the kinds of medical, physical, and cognitive challenges faced by class members—this is too often not the case in other nursing facilities. Unfortunately, the relatively small number of class members who, on average, reside in skilled nursing facilities scattered throughout the state typically make it impractical to provide staff there with the necessary training regarding class members' needs and, in turn, the full range of services which they require. As Commissioner Howe described:

> Those services become extremely challenging in nursing facilities because if you just look at a variety of issues in relation to active treatment, nursing facilities are basically not designed to provide care and treatment to individuals with mental retardation and developmental disabilities. Their major purpose is to provide care to individuals who have healthcare and nursing needs. Many staff at nursing facilities are not familiar with the developmental issues attended to individuals with mental retardation and developmental disabilities.

(Tr. (Doc. No. 493) at 24–25, May 22, 2008.) These facts were evident as well when the court visited nursing facilities in the company of counsel for the parties. (See Tr. (Doc. No. 489), Mar. 25.2008.)

To be sure, active treatment standards will not apply to class members living in community settings; but this has always been the case and was beyond the scope of the original settlement agreement as well. Nonetheless, the court takes note that DMR regulations, in fact, establish goals for residential supports and services that are quite similar to those of active treatment: personal dignity; the opportunity to exercise individual choice, participate in and contribute to the community, develop and sustain varied and meaningful relationships, and acquire skills that increase self-reliance pursuant to an individualized service plan; and, of course, the assurance of personal health, safety, and economic security. See 115 C.M.R. § 7.03 (2008).

Second, under the Agreement DMR will only recommend community placements based on individualized evaluations following transition planning. Granted, the Agreement maintains DMR's discretion to explore and, where appropriate, make available community placements for class members who will likely benefit from community living. (Agreement ¶ 4.) But, as represented by Defendants, community placement will not be proposed for any individual class member unless DMR determines that all of the class member's needs, including medical needs, can be met in an appropriately designed and staffed community setting.

Third, in accord with concerns expressed by the court when it preliminarily approved the Agreement, the parties have developed a Joint Plan for Transition Services consistent with ¶ 28(a) of the Agreement (Doc. No. 479, Ex. 1). In the court's view, the Joint Plan is adequate and reasonable. Among other things, it will identify the personal preferences, interests, relationships, environmental and physical support requirements, health care and dietary needs, of each class member who may be a candidate for community placement; that information is de-

signed to ensure that any community placement is appropriate. In addition, a transition services plan, when applicable, will be integrated into the class member's RISP, which will continue to be the primary service-planning document.

Fourth, in addition to receiving transition services, class members awaiting placement will continue to receive at least the level of specialized services called for in their particular RISPs. (Agreement ¶ 28.) To ensure this result, DMR will increase the number of service coordinators for class members and reduce individual caseloads so that coordinators can more actively engage with class members. (*Id.* ¶ 28(b).) Relatedly, the parties represent that the Agreement will make it possible for Defendants, over time, to ensure that all class members expected to remain in nursing facilities will receive active treatment as measured by the Court Monitor's protocol. The Agreement also calls for the Court Monitor to review the adequacy of active treatment for those class members not on the community placement list. In any case where she finds deficiencies, the Court Monitor will make specific findings and offer individualized recommendations so as to achieve full compliance. (*Id.* ¶¶ 33, 50.)

To be sure, as the parties well know, Defendants' failure to provide active treatment at levels called for by federal law has been of primary concern to the court; as described, this led to the court's appointment of the Court Monitor and the implementation of a more detailed protocol. The court is also cognizant of the fact that Defendants' continuing obligation to provide active treatment will be challenging even for the smaller number of class members who will remain in nursing facilities. Nonetheless, given the testimony at the fairness hearing—including the testimony of the Groton parents who, despite the court's concerns, were uniformly satisfied with the level of services provided their children—the court has confidence that the goal of active treatment is achievable. The court has come to this conclusion not only because of the more limited number of class members for whom active treatment will be required but, also, the fact that almost half the remaining class members will be in three pediatric nursing facilities where, given those numbers, active treatment can be more easily pursued.

Fifth, the Agreement is designed to better utilize Defendants' limited resources. Commissioner Howe reenforced this point at the fairness hearing:

It was clearly my professional judgment in terms of reviewing this issue, the duality of trying to provide active treatment and community placement, that the defendants, after I sought lots of advice from my own staff in whose professional judgment I have great confidence, that we could not do both.

(Tr. at 26, May 22, 2008.) In particular, she was confident that the Agreement would enhance DMR's ability to meet active treatment standards for those class members, deemed to number about one hundred to one hundred fifty, who were not expected to be placed into community residences. (See *id.*)

Quite simply, the parties agree that Defendants cannot invest the millions of dollars in community services for 640 class members (that will be needed to carry out the Agreement over the next four years) if they must also spend similar sums not only to provide active treatment in the interim to *all* class members in nursing facilities but to support the extensive monitoring previously ordered by the court. Having considered all the evidence, the court has come to the same conclusion.

Sixth and finally, the Agreement provides benefits which Plaintiffs could not

readily achieve through continued litigation. To be sure, given Defendants' apparent inability to fully meet their active treatment obligations, Plaintiffs would likely prevail in yet another enforcement action. But given the current state of Defendants' efforts, Plaintiffs are not likely to benefit, at least anytime soon, from further court enforcement orders regarding active treatment. The Agreement, in contrast, maintains Defendants' obligation to provide services at their current level, enhances their ability to provide active treatment for the reasons described, and, in particular, provides for hundreds of more community placements than were authorized by the original settlement agreement. As the court recognized years ago, it "is required to judge the reasonableness of the proposed settlement by evaluating the probable outcome of the litigation and weighing the remedies the class could secure from the settlement against the probable cost of continued litigation." *Rolland v. Cellucci,* 191 F.R.D. 3, 9 (D.Mass.2000) (citing, *inter alia, Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981)). Here, the balance weighs in favor of the Agreement in lieu of further litigation.

The Agreement, of course, does not provide a perfect resolution for those class members who have waited too long to be placed into the community or for those who must necessarily remain in nursing facilities. But a settlement need not be perfect. As the First Circuit has observed:

> [A]ny settlement is the result of a compromise—each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of

settlement is precisely to avoid such a trial.

*Greenspun,* 492 F.2d at 381 (citations omitted). Rather, as described, the court believes that the parties' settlement, as reflected in the proposed Agreement, adequately protects class members as a whole and vindicates their rights.

Granted, when the Agreement was initially submitted by the parties, the court itself voiced several concerns about its de-emphasis of active treatment and the lack of specificity with regard to transition services. (See Tr. Apr. 14, 2008.) As described, however, those concerns have been more than adequately addressed by the parties. Interestingly enough, it is not the active treatment standards that are of concern to those who would have the court reject the Agreement.

In contrast, the court had few, if any, concerns with the Agreement's community placement provisions. This was true of the original settlement agreement as well. As Commissioner Howe testified, the benefits to individuals of life in the community can be considerable:

> Ability potentially to be closer to families and guardians is certainly one. Ability to enjoy the same kind of quality of life and integrations with their community that all of the rest of us that live in the Commonwealth do is certainly another. Ability to attend good programs, services, and to have the benefit of healthcare services that are appropriate to their needs are certainly among some of the others.

(Tr. at 23, May 22, 2008.) To be sure, some concerns about the proposed Agreement's community placement provisions were voiced by several individuals (aside from the Groton parents) who received notice of the settlement. Those particular concerns were soon allayed, however, once its terms were better understood. (Cos-

tanzo Aff. (Doc. 479–4) ¶ 5.) The Groton parents, however, have raised their own concerns about community placement, among other matters, and it is to those concerns that the court now turns.

## B. *The Groton Parents' Concerns*

The Groton parents make three main points. While the Groton parents represent a relatively small percentage of class members, their concerns, of course, are no less important. First, they applaud the quality of care provided at Seven Hills and take issue with any suggestion that the care provided there might be inadequate. (See, *e.g.,* Tr. at 89–97, May 22, 2008.) Second, they are concerned that community residences will not be able to meet the particular medical and physical needs of their children; in essence, they maintain that their loved ones are too medically fragile to handle or benefit from a community facility. (See, e.g., *id.)* Third, the Groton parents express dismay that family members and guardians will not be involved in any evaluation of or planning for possible community placement and, relatedly, would lose any right to appeal from a community placement recommendation. (See, *e.g., id.* at 85–87.)

The court welcomes the concerns expressed by the Groton parents and understands, as best it can, the circumstances faced by them and their loved ones. However, as set forth in detail below, the court does not believe that the concerns identified by the Groton parents, some of which are not quite accurate, merit the outright rejection of the Agreement they seek.

As to the first point, the Groton parents have provided an important reminder that some nursing facilities—perhaps especially, but not only, pediatric facilities—often succeed in serving medically compromised individuals. This very point was borne out by the court's own prior visit, in the company of counsel, to a pediatric nursing facility in Northampton. Nonetheless, the court takes note of the Court Monitor's findings that Defendants have fallen far short of ensuring active treatment for class members in nursing facilities and, as well, the fact that class members who have moved from pediatric facilities into community residences have often improved and thrived. (See also Tr. at 58–60, May 22, 2008.) Still, the court recognizes that class members who are likely to remain in certain nursing facilities, including many who reside at Seven Hills, are receiving services quite satisfactory to their parents and guardians. In this regard, it must be understood that the provision of services at nursing facilities at current levels fits well within the Agreement's parameters.

As to the second point, the court recognizes that many class members may not benefit from community placement because of their medical or personal circumstances. However, this very concept is incorporated into the Agreement as well. As noted at the fairness hearing, this is the reason why roughly half the class members who reside at Seven Hills have been deemed inappropriate for community placement. In fact, of the four Groton parents who testified, two have children who have been preliminarily deemed *inappropriate* for community placement and one has a child who has not yet been evaluated because of his age. Only one has a child—who, it should be noted, leaves Seven Hills pretty much on a daily basis to go to high school—who has been tentatively placed on the community placement list. (Tr. at 104–10, May 22, 2008.)

In any event, as the parties took great pains to explain at the fairness hearing, Defendants' preliminary decision that certain class members may be appropriate for community placement is by no means final. That decision is merely a tentative deter-

mination that a transition services evaluation is warranted in an individual case. Moreover, as the parties have articulated, nothing in the proposed Agreement anticipates that class members could be forced out of nursing facilities against their will. Quite to the contrary, the evaluation process recognizes how difficult change may be for residents, their parents and guardians, and allows for both extensive input from family members and clinical reviews.

In this regard, the court takes note of the fact that many guardians and family members who initially opposed community placement under the original settlement agreement changed their minds when they learned more about community living, their role in the transition process, and the supports that were available. (See, e.g., Tr. at 49–56, May 22, 2008; Cieplik Aff. (Doc. No. 487) ¶ 7–40 (describing great satisfaction with her son's community placement despite years of resistance).) Commissioner Howe also spoke to the issue:

> On a personal level, I have long experience in working with families and with parents who have been initially resistant to placement. I have found that through both extending ourselves in every way possible to parents and families, being open with them, communicating well with them, sharing information about the potential services that are available—often times families have not had reason to come to know what services exist in our community system, and certainly the services that exist now are vastly different than the services that existed in the year 2000. We have great capacity to deal with individuals,

even those with the most serious medical issues.

> Often times parents and family members become much more open to the issue of community placement, and will actually in fact consider placement and report many times, even among people that have been very strident in opposition to the placement, report great and high levels of satisfaction with placement after it occurs.

(Tr. at 31–32, May 22, 2008.) [3] The court understands, of course, that these testimonials may not allay the concerns voiced by the Groton parents; nonetheless, it believes that this evidence may place those concerns in greater context.

Third, the Agreement does not limit any existing appeal rights, the Groton parents' assertions to the contrary. Defendants' counsel explained the situation as follows:

> The Commonwealth has no intent to move a class member to a community placement over their objection, if efforts to come up with the right individualized placement and to work with family members or guardians regarding the merits of the move prove to be unsuccessful. But as we showed in our memorandum, if in theory, hypothetically there were what some of the families are concerned about, a decision through [a review] process that community placement really is required for some reason and that an existing nursing facility placement should not be continued, it's required under federal law, it's implemented through state law. There are existing appeal rights that are in no way affected.

**3.** When later asked by the Groton parents' attorney whether certain severely compromised individuals could still profit from moving into community residences, Commissioner Howe answered "[a]bsolutely," because she has "had the pleasure of meeting individ-

uals that are similarly—that look to me, based on the written comments from parents of the Groton individuals, I've had the pleasure of meeting individuals just like that in homes throughout the community." (Tr. at 40, May 22, 2008.)

(Tr. 159–60, May 22, 2008.) In other words, in any case where Defendants deny a continued nursing facility stay because an available community-based program could meet an individual's needs, that decision is (and under the Agreement will remain) subject to appeal under existing law. In the end, the Agreement will actually add to, not limit, these rights.[4]

Finally, the Groton parents question why the Agreement does not give class members an absolute right to refuse a community placement. (See, *e.g.*, Tr. at 86–87, May 22, 2008.) As the parties point out, however, that is a right which never existed and, therefore, is not being taken away. In short, neither federal nor state law gives class members the right to reside in a particular facility. *See O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785–86, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980); *see also Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 910–11 (7th Cir.2003); *Lelsz v. Kavanagh*, 783 F.Supp. 286, 298 (N.D.Tex.1991) *aff'd*, 983 F.2d 1061 (5th Cir.(1993)). If anything, federal law *requires* Defendants to consider community placement and, as part of an annual review process, to determine whether "[t]he individual's total needs are such that his or her needs can be met in an appropriate community setting," and, "[i]f the inpatient care is appropriate and desired but the [nursing facility] is not the appropriate setting for meeting the individual's needs . . ., another setting such as an ICF/MR (including small, community-based facilities) . . . is an appropriate institutional setting for meeting those needs." 42 C.F.R. § 483.132(a)(1), (4).

Again, the court recognizes that this exposition may not allay all the concerns expressed by the Groton parents. It can only hope that, over time, the import of the Agreement, as well as the rights it protects, will come to be more fully understood, if not appreciated.

*Concluding Thoughts*

As indicated, a court's obligation is to determine if a proposed settlement agreement is fair, reasonable and adequate. Here, for the reasons stated, the court finds that the Agreement more than adequately meets these standards.

The Agreement provides a means by which to address the active treatment deficiencies identified by the Court Monitor and, at the same time, enhances community placement opportunities for class members. As the court recognized years ago when it approved the parties' original settlement agreement, "the immediate provision of all services due class members in nursing facilities, together with placement opportunities in the community, expands the horizons of mentally retarded and developmentally disabled individuals now confined to those facilities." *Rolland*, 191 F.R.D. at 9. The proposed Agreement strives to meet this goal.

In the end, the Agreement reflects an honest assessment by counsel for the parties on how best to remediate ongoing problems and represents an informed judgment, based upon knowledge of all relevant facts, on how to best provide substantial benefits to class members while protecting their rights and respecting their families' interests. Viewed in its entirety, the Agreement strikes a reasonable bal-

---

**4.** Under federal law, an individual who believes he is adversely affected by any such determination—including a determination during a regular review that a continued nursing facility stay should be denied because the individual should instead be transferred to a community placement—must be given the opportunity to appeal the decision. *See* 42 U.S.C. § 1396r(e)(3) and (f)(3); 42 C.F.R. §§ 431.220(a), 483.204 (2008). *See also* 42 U.S.C. § 1395i–3(e)(3) and (f)(3).

ance between the interests of the parties and affords class members the best opportunity to receive effective relief in the most timely fashion.

### IV. CONCLUSION

For the reasons stated, the parties' Joint Motion to Approve Settlement Agreement on Active Treatment is ALLOWED. Accordingly, the proposed Agreement is approved and, as approved, hereby becomes an order of the court.

IT IS SO ORDERED.