# United States Court of Appeals
## For the First Circuit

No. 08-1874

 ERIC VOSS, LAURA THIBAULT, FREDERICK CARTER, CHRISTOPHER PALEO,
ANGEL AGOSTA, KIMBERLY LAWRENCE, KELLEY SCHNAIR, ROBERT BUCKMAN,
NICOLE KEATING, MUSA NURISLAM, CHERYL COURTNEY, LENNIE LEBLANC,
LAURA PUTTERMAN, PEDRO CAVALLARO, DAVID BRAGA, AMANDA WATTS, ERIN
POULIN, SHERI BELVILLE, ALISSA CORMIER, BELEN GARCIA-SIMMONS, JESSE
STEWART, MARK CHAPMAN, UCHENNA OBI, STEFANIE PETRIE, LINDA KLAIBER,
JEANNETTE MCGINNIS, LAURA PROUTY, JILLIAN HUME, ANDRE AMATO, SHARIA
PITTS, PETER LIDDY, JOSHUA GREANEY, HOMER SWAIN, ANDREW PATTERSON,
PATRICK SHEEHAN, ANDREW CHAN, DYLAN KEENE, ABRAHAM CARRO, WILLIAM
CAMPBELL, POLO DEJESUS, EMILY SAM, ZACHARY FOSTER, WENDELL ROQUE,

Plaintiffs, Appellants,

v.

 LORETTA ROLLAND, MARGARET PINETTE, TERRY NEWTON, BRUCE AMES,
FREDERICK COOPER, LESLIE FRANCIS, TIMOTHY RAYMOND, ARC
MASSACHUSETTS, and STAVROS CENTER FOR INDEPENDENT LIVING,

Plaintiffs, Appellees,

v.

DEVAL PATRICK, JAY GONZALEZ, JUDYANN BIGBY, BRUCE M. BULLEN, ELIN
M. HOWE, CHARLES CARR, JOHN AUERBACH, and TERESA O'HARE, in their
official capacities,[*]

Defendants, Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Kenneth P. Nieman, U.S. Magistrate Judge]

---

[*]      Pursuant to Fed. R. App. P. 43(c)(2), several defendants
have been substituted for their predecessors in office.

                          Before

                    Lynch, Chief Judge,
              Selya and Stahl, Circuit Judges.

                    ───────────────────


        Stephen M. Sheehy with whom Anthony S. Fiotto, Jr., Michelle
R. Gonnam, Christiaan H. Highsmith, and Goodwin Proctor, LLP were
on brief for plaintiffs-appellants.
        Steven J. Schwartz with whom Cathy E. Costanzo, Center for
Public Representation, Jeffrey S. Follett, Catherine H. Wicker,
Foley Hoag LLP, Frank J. Laski, Mental Health Legal Advisors
Committee, Matthew Engel, and Disability Law Center were on brief
for plaintiffs-appellees.
        Kenneth W. Salinger, Assistant Attorney General, with whom
Martha Coakley, Attorney General, was on brief for defendants-
appellees.


                    ───────────────────


                    January 19, 2010

                    ───────────────────

**LYNCH**, **Chief Judge**.  This appeal by a small number of the plaintiff class challenges the 2008 approval of an amended settlement agreement between the remaining plaintiff class members and the state in a longstanding class action.  See Rolland v. Patrick (Rolland XI), 562 F. Supp. 2d 176 (D. Mass. 2008).  The original suit, brought in 1998 by developmentally disabled nursing home residents on behalf of over 1000 class members, alleged that Massachusetts did not provide appropriate treatments in appropriate settings to them as federal law required.  Here, 43 class members at one nursing facility object to the 2008 amended settlement under which many class members will be transitioned to community placements.  They fear it will lead to them being forced out of their particular nursing facility, where they prefer to stay.

The 2008 settlement resulted from the state's inability to comply fully with an earlier settlement, reached in 2000.  Under the 2000 settlement, the state successfully moved many class members to the community but failed to provide specialized services, including "active treatment," to those remaining in nursing homes.  See Rolland v. Cellucci (Rolland IV), 138 F. Supp. 2d 110, 120 (D. Mass. 2001).  The parties negotiated the amended settlement in 2008 to lessen the state's active treatment obligations and, instead, move most class members remaining in nursing homes to the community.

-3-

The appealing Groton parents,[1] who are parents and guardians, challenged the amended settlement in May 2008 on behalf of residents of the Seven Hills Pediatric Center (Seven Hills) in Groton, Massachusetts. They say their children and wards are more severely disabled than the rest of the plaintiff class and would not benefit from leaving Seven Hills. They objected that the amended settlement was unfair and sought decertification of the plaintiff class, which the district court had certified in 1999.

The district court found that the amended settlement was fair, reasonable, and adequate ("fairness"), Rolland XI, 562 F. Supp. 2d at 178, and denied the motion to decertify, Rolland v. Patrick (Rolland XII), No. 98-30208-KPN, 2008 WL 4104488 (D. Mass. Aug. 19, 2008) (order denying motion to decertify).[2] The court entered Rule 54(b) judgment on the Groton parents' objections to the settlement's fairness. Rolland v. Patrick (Rolland XIII), No. 98-3028-KPN (D. Mass. Nov. 20, 2009).

On appeal the Groton parents untimely attack the 1999 class certification order. More significantly, they challenge the

_____

[1] To avoid confusion, we will call the appellants the "Groton parents" and reserve the term "plaintiffs" for the plaintiff class, the appellees in this case.

[2] The parties agreed that a magistrate judge would handle all proceedings, Rolland v. Cellucci (Rolland I), No. 98-3028-KPN (D. Mass. Dec. 3, 1998) (order keeping case before magistrate judge), so we refer to the magistrate judge as the district court. The magistrate judge has issued a number of orders over the years and is very familiar with the case. See Rolland XI, 562 F. Supp. 2d at 177 n.1 (listing decisions).

-4-

approval of the settlement, objecting that it does not adequately protect class members who should not be transferred from their nursing homes to the community.  We affirm.

## I.

We review for abuse of discretion the district court's two decisions: whether to certify or decertify the class and whether to approve the amended settlement.  García-Ruberia v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009); McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 422 (1st Cir. 2007); City P'ship Co. v. Atl. Acquisition Ltd. P'ship, 100 F.3d 1041, 1043 (1st Cir. 2003).  We review underlying legal issues de novo. McKenna, 475 F.3d at 422.

The parties litigated and settled this case against the backdrop of a series of federal statutes[3] designed to move disabled individuals from institutions and integrate them into society.  The class plaintiffs sued under three statutes that were passed as part of this "deinstitutionalization" or "integration" movement[4]:

---

[3]  See, e.g., Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (codified as amended in scattered sections of 29 U.S.C.); Education of All Handicapped Children Act of 1975, Pub. L. No. 94-142, 89 Stat. 773 (codified as amended at 20 U.S.C. §§ 1405-06, 1415-20); Developmental Disabilities Assistance and Bill of Rights Act, Pub. L. No. 95-602, tit. V, 92 Stat. 2955 (1978) (codified as amended in scattered sections of 42 U.S.C.); Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (codified as amended at 42 U.S.C. §§ 3601-19, 3631).

[4]  The integration movement argued that the practice in the mid-twentieth century of confining the disabled in institutions was unnecessary and often harmful.  It believed the best and most

Medicaid, the Nursing Home Reform Amendments (NHRA), and the Americans with Disabilities Act (ADA).

Although Medicaid[5] originally funded mostly institutional services for disabled individuals,[6] Congress added optional programs that encouraged states to provide community-based Medicaid services to disabled individuals. See, e.g., Bryson v. Shumway, 308 F.3d 79, 82 (1st Cir. 2002). Massachusetts participates in several community programs.

In 1987 Congress amended Medicaid by enacting the NHRA. It had found that many states were reducing crowding at state institutions by transferring mentally disabled people to geriatric nursing facilities, which were poorly equipped to care for them. H.R. Rep. No. 100-391(I), at 459 (1987), as reprinted in 1987 U.S.C.C.A.N. 2313-1, 2313-279. The NHRA limits states to using

---

dignified setting for the disabled was their communities. See, e.g., J. tenBroek & F.W. Matson, The Disabled and the Law of Welfare, 54 Cal. L. Rev. 809, 816 (1966); see also Ricci v. Okin, 823 F. Supp. 984, 985 (D. Mass. 1993) (reporting the "deplorable conditions" the court found when visiting state institutions in the 1970s).

[5] Medicaid, created in 1965, uses state and federal funds to provide medical services to needy individuals. Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 61 (1st Cir. 2005). States can choose whether to participate in Medicaid and some optional programs. See Bryson v. Shumway, 308 F.3d 79, 81-82 (1st Cir. 2002). Once states do, they must meet applicable federal requirements. Rio Grande Cmty. Health Ctr., 397 F.3d at 61.

[6] See J. Karger, Note, "Don't Tread on the ADA": Olmstead v. L.C. ex rel. Zimring and the Future of Community Integration for Individuals with Mental Disabilities, 40 B. C. L. Rev. 1221, 1229 (1999).

Medicare funding for nursing home residents found, through a screening process, to need the level of care nursing homes provide. See 42 U.S.C. § 1396r(e)(7)(D)(ii).

That screening process is called a Preadmission Screening and Annual Resident Review (PASARR), and it requires states to assess whether "mentally retarded"[7] individuals (1) need the level of care nursing homes provide and (2) require specialized services. Id. § 1396r(e)(7)(B)(ii). States had to review all mentally retarded nursing home residents when the NHRA was enacted and still must review new admissions and residents whose conditions change significantly.[8] Id. § 1396r(e)(7)(B)(ii)-(iii). Generally nursing homes may not admit or must discharge anyone found not to need their services. See id. §§ 1396r(b)(3)(F)(ii), (e)(7)(C)-(D).

Title II of the ADA prohibits public entities from excluding disabled individuals from entities' "services, programs, or activities." 42 U.S.C. § 12132. This "integration mandate" requires states to place people in the "most integrated setting

---

[7] The NHRA uses the term "mentally retarded" to refer to individuals who have mental retardation or "a related condition" as defined in another provision. 42 U.S.C. § 1396r(e)(7)(G)(ii). The plaintiffs use the word "developmentally disabled" to reflect more precisely who the NHRA and similar provisions in this litigation cover. We generally use "developmentally disabled" except to accurately represent the text of the NHRA.

[8] Originally the NHRA required annual reviews of residents. Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, tit. IV, 101 Stat. at 1330-198. Congress amended the statute to only require PASARR review if a resident's condition changes. See 42 U.S.C. § 1396r(e)(7)(B)(iii).

appropriate," 28 C.F.R. § 35.130(d), often the community. <u>See</u> <u>Olmstead</u> v. <u>L.C. ex rel. Zimring</u>, 527 U.S. 581, 597-602 (1999).

II.

A.        <u>Historical Context</u>

To provide context for the 2008 settlement, we briefly review the history of the litigation. Greater detail may be found in the district court's opinions.

The original suit, brought under 42 U.S.C. § 1983 and Title II of the ADA, claimed Massachusetts was violating the ADA, several Medicaid provisions, and the NHRA by illegally limiting access to community programs and ignoring PASARR findings. Consequently, the state was allegedly confining many individuals to nursing homes who belonged in community placements and not providing them with specialized services while in nursing homes. The district court certified the plaintiff class in 1999. <u>Rolland</u> v. <u>Cellucci</u> (<u>Rolland II</u>), No. 98-30208-KPN, 1999 WL 34815562, at *1-2 (D. Mass. Feb. 2, 1999) (order certifying class).[9]

In 2000, the court approved a settlement between the parties. <u>Rolland</u> v. <u>Cellucci</u> (<u>Rolland III</u>), 191 F.R.D. 3, 15-16 (D. Mass. 2000). In the 2000 settlement the state agreed to place

---

[9]    The court certified a single class of "all adults with mental retardation and other developmental disabilities in Massachusetts who resided in nursing facilities on or after October 29, 1998, or who are or should be screened for admission to nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R 483.112 et seq." <u>Rolland II</u>, 1999 WL 34815562, at *1-2.

many class members in appropriate placements, divert people who would have been admitted to nursing homes to community placements, and provide class members with specialized services. Id. at 7. The state was not required to provide community placements to objecting class members. Id.

Over the next several years, the state satisfied its community-placement and diversion obligations, see Rolland v. Patrick (Rolland VIII), No. 98-30208-KPN, 2007 WL 184626, at *1 (D. Mass. Jan. 16, 2007) (order denying noncompliance motion). It placed about 1,000 class members in the community. But as all parties acknowledge, it largely failed to provide specialized services to about 800 class members who remained in nursing homes.

The district court held, and this court affirmed, that the 2000 agreement's specialized-services provisions required the state to provide "active treatment" to nursing home residents. Rolland v. Romney (Rolland VI), 318 F.3d 42, 57-58 (1st Cir. 2003); Rolland IV, 138 F. Supp. 2d at 115-16; Rolland v. Cellucci (Rolland V), 198 F. Supp. 2d 25, 28-35, 46 (D. Mass. 2002). Designed to cultivate independence in the developmentally disabled, "active treatment" is the federal standard of care for residents in Intermediate Care Facilities for Persons with Mental Retardation (ICF/MRs). See 42 C.F.R. § 483.440(a)(1). In 2007, the court and the parties agreed on a rigorous standard for active treatment based on federal ICF/MR regulations. See Rolland v. Patrick

-9-

(Rolland X), No. 98-30208-KPN (D. Mass. Aug. 2, 2007) (order adopting revised active treatment standards); Rolland v. Patrick (Rolland IX), 483 F. Supp. 2d 107, 117-18 (D. Mass. 2007).

The court also ordered the state to better coordinate with nursing home staff to ensure class members received active treatment in all settings. Rolland V, 198 F. Supp. 2d at 36-37, 46. It mandated what came to be called Rolland Integrated Service Plans (RISPs) for class members, which were "coherent, integrated treatment plan[s] which [would] guide[] [class members'] services across all settings." Id.[10]

For the state, these federal active treatment standards were difficult to coordinate and expensive, especially because class members were scattered in nursing homes across the state. The court found the state was not complying with its settlement obligations and with the court's orders four times between 2000 and 2007. See Rolland IX, 483 F. Supp. 2d at 117-18; Rolland v. Romney (Rolland VII), 273 F. Supp. 2d 140, 143 (D. Mass. 2003); Rolland V, 198 F. Supp. 2d at 36; Rolland IV, 138 F. Supp. 2d at 118, 120-21.

_____

[10] RISPs act as Rolland class members' individual service plans (ISPs), which state officials generally must develop for developmentally disabled individuals. See 115 Mass. Code Regs. 6.20. ISPs identify physical, developmental, and social goals for the person and what services the state will provide to help the individual meet those goals. Id. 6.23(4). An ISP team, which includes state service coordinators, individuals, their families, and their service providers, reviews these plans at least annually. Id. 6.21, 6.24.

In January 2008, a court monitor, whom the court appointed in 2007, Rolland IX, 483 F. Supp. 2d at 119, also determined that the state was largely failing to provide active treatment to class members in nursing homes.[11]  She concluded that many nursing homes were not equipped to provide active treatment, and class members in those homes should be moved to more appropriate settings.

B.        The 2008 Settlement

The state and the plaintiffs negotiated a new settlement to reduce the state's active-treatment burden in 2008.  In the 2008 settlement, the state agreed to move 640 of the 800 or so class members remaining in nursing homes to community placements over four years, based on preliminary assessments of the number of class members who could live in the community.  In exchange, only those not moved to the community would receive "active treatment" at the nursing home.  Class members identified for transfer to the community would receive any specialized services they were already receiving and some additional community-based services in lieu of active treatment.

This appeal primarily concerns the agreement's process for identifying class members for community placements.  As the agreement required, staff of the Department of Mental Retardation

_____

[11]    Among the 35 class members she surveyed, she found 94 percent did not receive active treatment as the court had defined it.

-11-

(DMR)[12] initially placed 666 people on a Rolland Community Placement List (the List) who they believed could benefit from community placement. DMR staff also identified 39 class members who were too medically fragile to move and 53 who should not be moved because of personal circumstances.

The agreement allowed DMR to remove people from the List whose condition changed, making community placement inappropriate. Anticipating that many new class members would be admitted to nursing homes, the agreement also permitted DMR to add up to 160 new class members to the List and substitute some new admissions for class members who died or were removed from the List.

The agreement provided DMR could move a List member to the community if it "determine[d], through the PASARR process, that" the person could "be safely served in the community, and that appropriate community services are, or will soon be, available for that individual." It gave class members no express right to veto transfer. The settlement agreement reserved all other rights, including appeals rights, of parties and nonparties. It also required the parties to notify class members and educate them about the agreement before final approval.

After a hearing, the district court granted preliminary approval of the amended settlement on April 14, 2008. Responding

---

[12] After the settlement, DMR's name was changed to the Department of Developmental Services.

to concerns the court had expressed during the preliminary-approval process, the parties fleshed out, in a Joint Plan for Transition Services (the Joint Plan), how the state would conduct "transition planning."  Specifically, the Joint Plan, which was part of the settlement agreement, outlined how the state would decide during "transition planning" whether "appropriate community services and supports" were available in the community for List members and what specialized services they should receive while awaiting transfer.

The Joint Plan required coordinators or case managers[13] to propose a detailed plan for moving any List member to the community in a twenty-nine-page planning sheet.[14]  On that sheet, coordinators and a registered nurse would first describe class members' lifestyle, abilities, needs, and medical histories.  They would compile this information based on clinical assessments and prior work with class members and their families.  Coordinators would review that proposal with RISP team members, who include

[13]   A service coordinator is a DMR staff member who supervises state-provided services for mentally retarded individuals.  A case manager is the staff member of a University of Massachusetts program who coordinates services for individuals with other developmental disabilities.  See Rolland V, 198 F. Supp. 2d at 43, 46.  We use "coordinator" to refer to both positions.

[14]   The planning sheet required coordinators to plot every aspect of a proposed transition into the community.  For example, it asked what services and supports the individual would need, where the person would live, and where the person would receive services.  It also asked how the person's financial, health-and-safety, equipment, and medical needs would be met in the new setting.

class members, their families, representatives from their nursing homes, DMR clinical and professional staff, and relevant clinical professionals. State officials would review the RISP team's plan.

C.        The Groton Parents' Objections to the Settlement

On May 12, 2008, the Groton parents filed a motion objecting to the settlement and to class certification, after the plaintiffs presented the proposed settlement at a meeting at Seven Hills. On May 20, they filed a motion to decertify the class. Of the 800 class members affected by the amended settlement, these 43 Seven Hills residents were the only objectors.

Seven Hills is a pediatric nursing facility that specializes in caring for developmentally delayed children and young adults with significant medical problems. The Groton parents argued that the differences between their children and the class representatives made class certification improper and made the class representatives inadequate. They also sought a provision giving them the right to veto a transition decision, as the 2000 settlement had done.

The court held a fairness hearing on May 22, 2008, on the 2008 amended agreement. The plaintiffs and the state argued that the agreement offered a new chance for most of the rest of the class to be placed in the community and better used the state's

limited resources.[15] They insisted that class members had no right to reject community placement, but they assured the court that the state would not move any class members unless it found them appropriate placements.

In support, the state DMR commissioner explained how DMR would decide whether to move class members to the community. She emphasized that the List was tentative. Through transition planning DMR would consider every aspect of a possible move, including whether the move would be safe and whether it would match the class member's needs and preferences. She said the state wanted to use that process to work with families before anyone eliminated community placement as an option; in her experience, many families who initially resisted community placement eventually found it very satisfactory.

One class member and two relatives of class members testified about their positive experiences with community services. But four Groton parents expressed concern that community settings were inadequate, described the high quality of care at Seven Hills, and asked for authority to decide the best placement for their children and wards.

Counsel for the state also clarified that the state would not move class members "over their objection, if efforts to come up

---

[15] Most of the 92 class members not currently on the List lived in three pediatric facilities; the state believed it could afford to provide and coordinate active treatment for this group.

-15-

with the right individualized placement and to work with family members or guardians regarding the merits of the move prove to be unsuccessful." Counsel agreed with the court's assessment that the state was reserving the right, in "extreme" cases, to decide that community placement is best for a class member if the person's family was unreasonable.

The district court approved the settlement as fair, reasonable, and adequate at the hearing and explained its reasoning in an order issued on June 16, 2008. Rolland XI, 562 F. Supp. 2d 176. In a separate decision, dated August 19, 2008, the court denied the Groton parents' motion to decertify the class. Rolland XII, 2008 WL 4104488, at *1. We discuss the court's findings and reasoning in our discussion below.

In light of the entry of the Rule 54(b) judgment, the parties agree we have appellate jurisdiction over the issues regarding the settlement's fairness; they disagree whether we have jurisdiction over the other issues the Groton parents raise.

III.

A.        Scope of the Appeal

The only judgment over which we have appellate jurisdiction, for various reasons, is the Rule 54(b) judgment of the district court as to the fairness of the class settlement. We do not reach the Groton parents' arguments that the district court improperly certified the class or denied class decertificaiton.

-16-

The class was certified in 1999, but the Groton parents did not then appeal within ten days[16] after the class certification order, as they could have done under Rule 23(f).  See Fed. R. Civ. P. 23(f).  Nor did they for the next decade seek entry of a Rule 54(b) order allowing them to appeal the class's certification. They try to excuse this failure by arguing that they never received notice of the litigation or the class and that, in any event, the district court had some obligation to monitor the defined class. On these facts, these excuses are unavailing.[17]

The Groton parents did move to decertify the class.  The district court expressly found that they had notice of the

[16]  Rule 23(f) now gives parties fourteen days to appeal. See Fed. R. Civ. P. 23(f).

[17]  It is true that, "[e]ven after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982); see also Fed. R. Civ. P. 23(c)(1)(C). That rule does not modify Rule 23(f)'s filing deadline for interlocutory review of a certification or decertification order.
The Groton parents try to rely, first, on Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997).  That case discussed courts' obligations when reviewing class certification for settlement only and not for litigation. Id. at 620.  It does not apply.
They also cannot rely on Stephenson v. Dow Chem. Co., 273 F.3d 249 (2d Cir. 2001), vacated in part on other grounds, 539 U.S. 111 (2003).  In Stephenson the class members suffered exposure to Agent Orange; the individuals collaterally attacking the settlement had not become ill from exposure until after the settlement was approved and its funds disbursed. Id. at 260-61.  The court held that because they did not know they suffered injury from exposure when the case concluded, they lacked notice and adequate representation. Id.  Binding them to the settlement through res judicata would violate due process. Id.  The Groton parents are not challenging this settlement after it terminated; indeed the district court let them object to class certification.

-17-

settlement and heard their objections to the class. Rolland XII, 2008 WL 4104488, at *6. Significantly, they failed to file a notice of an appeal from that order. That dooms their attempt to raise the class certification issue before us.[18]

B.      Fairness, Reasonableness, and Adequacy of the Settlement

The heart of this appeal is a challenge to the district court's approval of the amended settlement. District courts may only approve class action settlements that are fair, reasonable, and adequate. City P'ship, 100 F.3d at 1043. They enjoy great discretion to "balance [a settlement's] benefits and costs" and apply this general standard. Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Ass'n, 582 F.3d 30, 45 (1st Cir. 2009).

As we understand their briefs, the Groton parents raise two objections to the proposed settlement. First, they claim they lacked timely notice of the settlement. Second, they urge that the settlement is unfair because it does not give the Groton parents power to refuse community placement for their children and could force their children to leave Seven Hills, against their parents' wishes or view of their children's best interests.

_____

[18] On appeal the Groton parents advance an entirely frivolous standing argument, purportedly based on Article III, not raised in the trial court and not within the scope of our interlocutory jurisdiction. There is simply no question that the certified class met all Article III requirements.

1.        Notice

The Groton plaintiffs do not dispute that they eventually learned about the settlement, but they contend that notice was tardy. They point out they were notified of the settlement after it was negotiated and after DMR had created the List. With earlier notice they say they could have negotiated for a provision granting them the right to refuse community placement in the settlement and consulted with DMR about their children's placement on or absence from the List.

In its opinion denying class decertification, the district court found that they had adequate notice of the proposed settlement; indeed, plaintiffs' counsel personally explained the agreement to Groton parents at Seven Hills on May 6, 2008. Rolland XII, 2008 WL 4104488, at *6. This conclusion was not clearly erroneous, and the district court did not abuse its discretion by rejecting this notice argument as an attack on the settlement. It gave the Groton parents a full and fair hearing on their objections. The Groton parents also cite no authority saying they were entitled to participate in settlement negotiations, a questionable proposition given Rule 23's provision for class counsel. See Fed. R. Civ. P. 23(g)(4).

2.        Method for Placing Class Members in the Community

At bottom, the Groton parents contend the settlement is unfair because it does not adequately protect class members from

-19-

being forced to move to community placements. Their concerns are threefold. First, they say the settlement creates a <u>final</u> List for transfer and does not require the state to assess class members individually or consult with their families. Second, they fear the settlement creates a "quota" for community placements, requiring the state to transfer class members even if doing so is unwise. Third, they argue that <u>Olmstead</u> and a grandfather provision in the NHRA, 42 U.S.C. § 1396r(e)(7)(C)(i), give them a right to refuse community placement and the settlement is flawed because it does not expressly protect this right.

The district court did not abuse its discretion by finding the agreement was fair despite these objections. The Groton parents misunderstand key aspects of the agreement that, in fact, sufficiently protect class members.

In part their reading is flawed because they overlook the scope of the material that the court appropriately reviewed and relied on to approve the settlement and that we may consider on appeal. That material includes the amended Settlement Agreement on Active Treatment, the Joint Plan that further elucidated the procedures to be followed under the agreement, relevant federal and state regulations, and representations that state officials made

about how they understood their obligations.  See Rolland XI, 562 F. Supp. 2d at 178-79, 180-81, 183-84, 185 n.4.[19]

a.          Finality of the List

The Groton parents urge us to accept their interpretation of the agreement: that the List is final and the state will conduct no further individualized review of class members.  The district court reached, and the record supports, two conclusions that undermine the Groton parents' reading of the agreement.

First, the List reflects a preliminary but not final determination that certain class members may be appropriate for community placement and transition planning is warranted.  Id. at 183.  DMR will conduct individualized evaluations during transition planning and consider the wishes of class members' families.  Id. at 180, 183-84.  It will only recommend community placement if it determines that all of a class member's needs, including medical needs, can be met in an appropriately designed and staffed community setting.  Id. at 180.

---

[19]     We review the evidence presented during fairness hearings when determining whether a district court abused its discretion by approving a settlement.  See, e.g., Dikeman v. Progressive Exp. Ins. Co., 312 F. App'x 168, 171 (11th Cir. 2008) (affirming the district court in part on "the testimony and evidence presented at the fairness hearing"); United Auto., Aerospace, and Agric. Workers of Am. v. General Motors Corp., 497 F.3d 615, 636 (7th Cir. 2007) (reviewing "live testimony" from a fairness hearing); Walker v. City of Mesquite, 858 F.3d 1071, 1072-73 (5th Cir. 1988) (noting the district court considered "oral testimony and documentary exhibits").

The settlement limits when DMR may transfer List members. DMR must "determine[], through the PASARR process, that a class member [on the List] can be safely served in the community, and that appropriate community services and supports are, or will soon be, available." During PASARRs, the state assesses, in consultation with class members and their families, 42 C.F.R. § 483.128(c)(3), whether a nursing home, community setting, or another placement is best for each individual. Id. § 483.132. It must decide by reviewing an individual's physical and mental health and ability to perform daily tasks. Id. § 483.132(c).

If the state concludes a community placement is the best setting, as the DMR commissioner and the state's counsel explained, it will then determine whether an appropriate placement is available during transition planning. Under the Joint Plan, the state must review class members' personal and medical needs and plan, in careful detail, transition to a "safe" and "appropriate" community setting, as the settlement requires. Coordinators must review this plan with RISP team members, including family members and clinical professionals. The district court could accept, as the DMR coordinator and the state's counsel requested, that the state needs time to work with families during this process before

making a final decision about community placement for List members.[20]

Second, the district court found residents had appeal rights from a decision by the state contrary to the wishes of a parent or guardian, which the agreement did not limit. Rolland XI, 562 F. Supp. 2d at 184. The settlement reserves any other legal rights class members have; the parties agree this clause preserves class members' appellate rights.[21]

As the parties agree, the NHRA allows anyone adversely affected by a PASARR determination to appeal through a state process. 42 U.S.C. § 1396r(e)(7)(F); 42 C.F.R. § 431.220(a)(4); id. § 483.204(a)(2). State regulations also let Medicaid beneficiaries appeal decisions by the state Medicaid agency "regarding the scope and amount of assistance (including, but not limited to, level-of-care determinations)," 130 Mass. Code. Regs. 610.032(A)(5), and imposing "any condition . . . for assistance or receipt of assistance that is not authorized by federal or state law or regulations," id. 610.032(A)(7).

---

[20] During transition planning the state will also consider what enhanced specialized services List members should receive and incorporate that plan into their RISPs. Though focused on services and not placement, the RISP process is another time the state will review class members' needs with them and their families.

[21] The settlement also expressly creates some appellate rights not relevant to the Groton parents' concerns.

-23-

Class members may appeal PASARR and Medicaid determinations in the state's administrative "fair hearing" process. 130 Mass. Code Regs. 456.412(B); id. 610.032(A). The fair hearing involves an evidentiary hearing before an impartial agency officer who issues a final, written decision. See id. 610.012-.086. Some cases may receive a rehearing. Id. 610.091. Parties may seek judicial review in Massachusetts state court. Id. 610.092.

b.        Whether the Settlement Creates a Required Quota for Placement

The Groton parents contend the agreement could force the state to improperly transfer class members who belong in nursing homes because it creates a "quota" for placing 640 individuals in the community. This argument overlooks how the settlement protects class members from inappropriate transfers and the size of the pool of class members eligible for transfer.

Under the agreement, the state will transfer class members incrementally over four years. As we explained above, the state will carefully review whether a safe, appropriate placement is available for individuals before moving anyone, and class members may appeal adverse decisions. The state may also, per the agreement, keep class members off the List who should not be transferred because of medical needs or personal circumstances. Indeed, roughly half of the residents of Seven Hills had been "deemed inappropriate for community placement," including the

children of two of the four parents who testified at the fairness hearing, for this reason. <u>Rolland XI</u>, 562 F. Supp. 2d at 183.

The settling parties expect far more class members will be eligible for transfer than the state can accommodate in community placements. The state has initially determined 666 class members could benefit from community placement. DMR can add up to 160 new nursing home admissions and substitute even more admissions for class members who die or are removed from the List. If too few class members could be safely transferred, the parties have represented to this court that they will renegotiate the agreement.

c.      Right to Refuse Community Placement

Finally, the Groton parents argue that the agreement is unfair because it does not give them an absolute right to refuse community placement for their children. They say <u>Olmstead</u> and, especially, a grandfather provision in the NHRA, 42 U.S.C. § 1396r(e)(7)(C)(i), give them this right and the agreement is unfair if it does not expressly protect it. We do not need to interpret § 1396r(e)(7)(C)(i) definitively and believe it is unwise to do so in the abstract. The settlement is nonetheless fair because it allows individual class members to raise this objection in other settings, where they can assert any rights they may have.

The "grandfather provision," § 1396r(e)(7)(C)(i), allows some "long-term" residents of nursing homes to choose to remain in their current nursing facility. At a minimum eligible residents

-25-

must have been determined to need specialized services but not nursing home care during a PASARR and must have lived in a nursing home "for at least 30 months before the date of the determination." Id. The parties dispute when that PASARR determination needed to occur; we need not resolve this issue.[22]

It is indisputable that whether an individual is a "long-term resident" under the statute is a fact-based inquiry. It depends on the timing and results of the person's PASARRs and where the person has lived. This issue is best resolved in the individualized review process we have described above: during class members' PASARRs, during the transition process, and on appeal.

In light of these facts, it was not an abuse of discretion for the district court to refuse to strike down the settlement to more expressly protect any rights a few class members may ultimately prove they individually have. The court could choose to approve a settlement that benefits the vast majority of the class, including those whom the state does not want to move from Seven Hills, since it adequately protects objectors' rights.

---

[22] The parties disagree whether the grandfather provision applies only to residents who lived in nursing homes and received their first PASARR before April 1, 1990, or to residents who lived in a nursing home for thirty months before a PASARR finding that they no longer need nursing home care. Nothing in the district court's decision or this decision prejudices class members' right to argue they are "long-term residents" under either interpretation to the state and on appeal. The district court's conclusion that class members had no legal right to remain in nursing homes, see Rolland XI, 562 F. Supp. 2d at 185, is not precedent on this issue.

-26-

Olmsted, on which the Groton parents alternatively rely, adds nothing to their claim. Olmstead interpreted the scope of state authority to retain individuals in institutions under the integration mandate of Title II of the ADA. 527 U.S. at 592-93, 602. But Title II is not the basis for the state's authority to transfer class members to the community in the settlement agreement; the NHRA is.[23]

IV.

We affirm the judgment approving the fairness, reasonableness, and adequacy of the 2008 amended settlement agreement. The Commonwealth has made many commitments to this court about ensuring the fairness of the placement process going forward, and we expect that they will abide by those commitments. Costs are awarded to the plaintiffs and the state.

---

[23] The Groton parents do not contend Olmstead or Title II modified the NHRA. As the district court noted, the NHRA actually requires the state to move most individuals from nursing homes if they do not need that level of care. Rolland XI, 562 F. Supp. 2d at 185. The NHRA prohibits federal Medicaid payments to cover unnecessary nursing home care for individuals other than long-term residents. See 42 U.S.C. § 1396r(e)(7)(D)(ii).

-27-